## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| The Estate of Edward Brian Halloran by Patricia Maccarelli, in her Capacity as Administratrix of the Estate of Edward Brian Halloran ) ) ) ) ) ) | |
| Plaintiffs, ) | Civil Action No. 01-11346-RCL |
| v. ) | |
| United States of America, *et al.* ) ) | |
| Defendants. ) | |
| Patricia Donahue, Individually and in her Capacity as Administratrix of the Estate of Michael J. Donahue, and Michael T. Donahue, Shawn Donahue, and Thomas Donahue ) ) ) ) ) ) ) | Civil Action No. 01-10433-RCL |
| v. ) | |
| United States of America, *et al.* ) ) | |
| Defendants. ) | |

## THE UNITED STATES' POST-TRIAL BRIEF

## INTRODUCTION

On November 19, 2007, this Court entered an order of summary judgment on liability in favor of plaintiffs on their claims for wrongful death. The matter came on for trial to the Court on the issue of damages March 10-13, 2008, at the conclusion of which, the Court instructed the

parties to submit post-trial briefs on the issues before it.[1]  The defendant, United States of America, by and through its undersigned counsel, hereby respectfully submits its post-trial brief.

The United States recognizes that two lives were wrongfully taken and that it has been held liable for those deaths.  As discussed below, however, the FTCA and the Massachusetts wrongful death statute impose substantial restrictions and evidentiary burdens on a plaintiff seeking damages.  The evidence presented by plaintiffs at this trial was insufficient to meet those burdens in several ways, including: 1) plaintiffs' economic testimony in support of an award for lost income to the survivors was fundamentally flawed; 2) the Donahue plaintiffs failed to present competent evidence of conscious pain and suffering on the part of the decedent; and 3) the Halloran plaintiffs presented little or no evidence supporting an award for loss of consortium to Mr. Halloran's sons, who did not testify, or to Mrs. Macarelli.

It is the duty of the Court both to ensure that any final judgment is not excessive, and that it "be supported by evidence that establishes a reasonable basis for the recovery." Massachusetts Tort Damages 2d § 4-5 (Michael Bogdanow ed., Lexis Law Publishing, 2004).

## STATUTORY FRAMEWORK

Plaintiffs bring this consolidated action against the United States pursuant to the Federal Tort Claims Act, 28 U.S.C. §§ 1346(b), 2671-2680, through which plaintiffs are entitled to recover certain damages allowed in the Massachusetts wrongful death statute, which provides, in relevant part, as follows:

A person who (1) by his negligence causes the death of a person, or (2) by willful, wanton or reckless act causes the death of a person under such circumstances that

---

[1]  The Court also requested proposed Findings of Fact and Conclusions of Law, which are extracted from and appended to this Brief as Exhibit 1.  Tr. 4-129.

> the deceased could have recovered damages for personal injuries if his death had
> not resulted ... shall be liable in damages in the amount of: (1) the fair monetary
> value of the decedent to the persons entitled to receive the damages recovered, as
> provided in section one, including but not limited to compensation for the loss of
> the reasonably expected net income, services, protection, care, assistance, society,
> companionship, comfort, guidance, counsel, and advice of the decedent to the
> persons entitled to the damages recovered.

ALM GL ch. 229, § 2[2]

In addition, the administrator may recover an award to compensate the decedent's estate for his conscious pain and suffering prior to his death.  ALM GL ch. 229 § 6.

Under the applicable Massachusetts law, the purpose of the compensatory award is to financially compensate the appropriate beneficiary or beneficiaries for the monetary value of contributions, services and support that they reasonably expected from the decedent.  *Durdle v. Baron*, 104 N.E.2d 421, 423 (1952).   The proper extent of compensatory damages is measured by the "fair monetary value of the decedent to those entitled to recover."  *Burt v. Meyer*, 508 N.E.2d 598, 601 (1987), *quoting Guy v. Johnson*, 448 N.E.2d 1142, 1143, *review denied*, 452 N.E.2d 1158 (1983).   However, Massachusetts law is very clear that compensation for the grief, anguish and bereavement of the survivors in response to the decedent's death is improper. *McCuish v. Volkswagenwerk A.G.*, 494 N.E.2d 390, 398-400 (1986), *aff'd*, 508 N.E.2d 842 (1987); *Mitchell v. United States*, 141 F.3d 8, 20-21 (1st Cir. 1998).

---

[2]  The "section one" of G. L. c. 229, referred to in this quoted text, provides for damages to be assessed with regard to the culpability of the defendant and recovered by the executor or administrator of the deceased person "to the use of the following persons and in the following shares: ... (3) If the deceased shall have been survived by a wife or husband and by more than one child surviving either in person or by issue, then one third to the use of such surviving spouse and two thirds to the use of such surviving children or their issue by right of representation.  Mass. Gen. Laws ch. 229, § 1.

Further, in an action under the Federal Tort Claims Act, "the United States ... shall not be held liable for ... punitive damages."  28 US.C. § 2674; *Poyser v. United States*, 602 F. Supp. 436, 439-440 (D. Mass. 1984); *D'Ambra v. United States*, 481 F.2d 14 (1st Cir.1973).  The FTCA also expressly prohibits recovery for prejudgment interest.  28 U.S.C. § 2674.

## DISCUSSION

As shown by the foregoing, an award in this case may be comprised of three general items of loss: 1) loss of reasonably expected net income to the statutory beneficiaries; 2) conscious pain and suffering of the decedent; and 3) loss of consortium (*i.e.,* society, companionship, comfort, services and guidance) suffered by the decedent's wife and children. The evidence presented in support of these items of damage is discussed below.

**1.     Loss of Reasonably Expected Net Income to Statutory Beneficiaries**

This item of damage presents a specific evidentiary burden for plaintiffs.  They may choose to present evidence of the decedent's total lost income, however, in doing so the presumptive takers under the statute (wife and children) must then prove how much of that gross amount he or she lost as a result of the decedent's death.  *Mitchell v. United States*, 141 F.3d 8, 19-20 (1st Cir. 1998) ("a presumptive taker is entitled to nothing beyond what it is proven at trial he or she lost as a result of the decedent's death");  *DaSilva v. American Brands, Inc*., 845 F.2d 356, 362 (1st Cir. 1988) ("To support an award for loss of expected income, the plaintiff must show the fair monetary value of the decedent to the beneficiary.").

**A.)     Halloran Plaintiffs**

The Halloran plaintiffs failed to present reliable evidence for recovery on this item of damage.  They presented the testimony of an expert economist, Dr. Allan McCausland, who, as is clearly stated on the summary of his findings, Exhibit 11, calculated only the total net economic

4

loss to the Halloran Estate, which he concluded was $631,562.  This amount was reached without

resort to any evidence related to Mr. Halloran.  Rather, the expert simply calculated lost earnings

of the average male high school graduate from 1982 (date of death) to 2006 (date of retirement),

adjusted for present value.  Tr. 2-30 to 2-31.  More importantly, neither the expert (Tr. 2-57), nor

any other witness, made any attempt to estimate the amount from this gross figure that would

have been provided to the statutory beneficiaries.  "[T]here is substantial authority for excluding

calculations of projected earnings unrelated to contributions to the household."  *Lane v. Meserve*,

482 N.E.2d 530, 534 (Mass. App. Ct. 1985)

       Dr. McCausland's testimony revealed additional substantial weaknesses in his

calculation, the most prominent of which was his failure to consider Mr. Halloran's personal,

actual employment and earnings history, which was far from the "average male high school

graduate."  Tr. 2-63.  Indeed, the report of his earnings obtained from the Social Security

Administration, Exhibit 7, revealed that Mr. Halloran earned essentially no legitimate income in

the three years before his death.[3]

       Plaintiffs have argued that they should not be held to their burden of proof for their lost

earnings claim because income tax returns are unavailable due to the passage of time since his

death, a point raised by this Court during closing argument.[4]

---

[3]  The actual earnings amounts for the ten years before his death, by year, were as follows.
1972: $0; 1973: $0; 1974: $123.43; 1975: $0; 1976: $169.92; 1977: $16,930.89; 1978:
$8,009.38; 1979: $0; 1980: $460; 1981: $240; 1982: $0.

[4]   If, as I have found, the United States is responsible for these deaths and they occurred so
long ago that the tax returns are not available so that the proof necessarily becomes less
exacting of any loss of net income, should I take that into account when I look at the kind
of evidence produced by these plaintiffs?  In other words, should I draw some inference
adverse to the United States growing out of its responsibility both for the deaths and for
the fact that we find ourselves here in the courtroom trying this case – what is this I can't

As an initial matter, the idea of lowering plaintiff's burden of proof on damages as a punitive measure for the defendant's liability conduct appears unprecedented and would constitute error.  Moreover, a related question is whether this extraordinary relief is warranted with respect to the Estate of Brian Halloran, where the evidence in the record established that he was a career criminal.[5]  Mr. Halloran's criminal history was fleshed out in more detail by former FBI Special Agent Gerald Montanari, to whom Mr. Halloran confessed his criminal past in late 1981 and early 1982 as part of his cooperation with the FBI.  Agent Montanari, based on the reports he prepared at the time of his conversations with Mr. Halloran, testified that Mr. Halloran confessed to his participation in the murder of George Hughes with the Winter Hill gang in the late 1960s, and thereafter became accepted as a member of that criminal organization.  Tr. 4-47.  Mr. Halloran admitted to several periods of incarceration, and confessed that shortly after his release from prison in 1973, he participated in the murder Mr. Joe Notarengelli.  Tr. 4-51.  He also confessed to committing other murders unrelated to the Winter Hill gang.  Tr. 4-81.  Mr. Halloran further confessed to being a collector and enforcer for loan sharking activities

---

do math so well  – but more than two decades after the event?

Tr. at 4-90.

[5]    A portion of Mr. Halloran's criminal record, which includes only crimes for which he was caught, arrested and arraigned in Massachusetts, was admitted as Deft's Exhibit 8.  It includes the following charges (arraignment dates in parenthesis):  Assault with a Dangerous Weapon (1/16/81); Larceny (1/16/81); Burglary (12/16/80); Assault with a Dangerous Weapon (12/16/80); Armed Robbery (12/16/80); Assault and Battery with a Dangerous Weapon (5/9/75); Possession of Firearm (4/8/75); Larceny (4/8/75); Assault and Battery with a Dangerous Weapon (3/29/74); Assault and Battery (3/6/69); Larceny (5/13/68); Assault and Battery with a Dangerous Weapon (3/11/68); Conspiracy (3/11/68); Larceny (3/11/68); Assault and Battery on a Police Officer (2/26/68); Disorderly Conduct (2/26/68); Breaking and Entering (11/27/67); Fraud (6/20/67); Larceny (4/25/67); Assault and Battery with a Dangerous Weapon (4/24/67); Threatening (12/9/65).   Deft. Ex. 8.

throughout the 1970s, burning down a night club in late 1974, and the robbery of a jewelry store in 1979, as well as crimes he planned but were carried out by others.  Tr. 4-44 - 4-51.

This history of violent crime continued right up to the time Mr. Halloran met with the FBI, having been charged with the murder of George Pappas only two months before coming to the FBI.  Tr. 4-50.  Mr. Halloran explained that he himself had also been targeted for murder attempts in the Summer of 1981, the Fall of 1981, and December 1981, all before he began cooperating with the FBI.  Tr. 4-53 - 4-54.

This explication of Mr. Halloran's life of crime was corroborated in large measure by his widow, Mrs. Macarelli.  She testified that she met Mr. Halloran in the Summer of 1979, when she was 20 and he was 39, though he lied to her about his age. Tr. 3-68; Tr. 3-80.  The couple moved to Ft. Lauderdale, Florida in September or October of that year and married on October 9, 1979.  Tr. 3-68.

During the marriage, Mr. Halloran paid for all of their living expenses with cash, including the purchase of a 1977 Lincoln, as well as a Cadillac automobile.  Tr. 3-79.  During the entire time that Mrs. Macarelli knew Mr. Halloran, 1979-1982, he never told her what, if anything, he did to earn his money.  Tr. 3-80.  During that time he was never employed in any legitimate job and Mrs. Macarelli had *no idea* where he got his cash.  Tr. 3-91.  Indeed, she claims the couple never even discussed it.  Tr. 3-84.  During their marriage, Mrs. Macarelli was never employed and had no assets or other legitimate means of support.  3-75.  Yet the couple spent their days flying back and forth between Boston and Florida, playing racquetball, going to clubs, and "went out to dinner a lot."  Tr. 3-73; Tr. 3-77.  Mrs. Macarelli did confirm the multiple attempts on Mr. Halloran's life, one of which occurred when he was shot at while she

was present in the car with him.  Tr. 3-86.   At the time of his death, Mr. Halloran had amassed

no assets and had no bank account.[6]  Tr. 3-72; 3-92.

The evidence confirms that Mr. Halloran was a career criminal who engaged in multiple

felonies, including murders.  The income he obtained, and the economic benefits he conferred on

his statutory survivors, were the proceeds of violent criminal activity.  It would be an affront to

the policies behind the wrongful death statute to compensate his survivors for this type of ill-

gotten lost benefits.  *See, Gibbs v. United Mine Workers of Am.,* 343 F.2d 609, 618 (6th Cir.

1965) *rev'd on other grounds* 383 U.S. 715 (1966) (affirming lower court's decision that 'profit

estimates which contemplate illegal operations will not support an award, especially where they

provide no means of separating the legal from the illegal."); *Murray v. Interurban St. Ry. Co.,*

102 N.Y.S. 1026, 1027-1038 (N.Y. App. Div. 1907) ("when a person is committing a crime, he

cannot use the wages paid to him for doing it as the basis for a recovery in a civil action.").

The most reasonable expectation regarding Mr. Halloran's future earnings, based on the

evidence, is that he would continue to derive income from criminal activity.  Additionally, the

evidence of the multiple attempts on his life, prior to any contact with the FBI, demonstrates that

his life expectancy was not normal, as proffered by plaintiffs.  The claim that Mr. Halloran would

have suddenly extricated himself from criminal activity and its risks is pure speculation.[7]  For

---

[6]  The couple moved back to the Boston area in 1980, where she gave birth to Mr. Halloran's son Sean in July 1980, and Justin in December 1981. Tr. 3-76 - 3-78.

[7]  In closing, plaintiffs' counsel argued that he was confident that Mr. Halloran was going to "go straight" after speaking with the FBI in early 1982, as did Mr. Weeks and Mr. Martorano. Tr. 4-127.  This speculation ignores the fact that, as Agent Montanari testified, the information Mr. Halloran was providing was not corroborated (he lied about the Callahan murder), he did not cooperate with the restrictions placed on him, and Mr. Halloran was not offered the witness protection program.  Tr. 4-65 - 4-68.

these reasons, there is no legal or equitable basis for the Court to lower the standard of proof for plaintiffs' claim for compensation for lost economic benefits from him.  *See, e.g., Durdle v. Baron*,104 N.E.2d 421, 423 (1952) (jury should consider stability and duration of decedent's employment and income level, and amount and continuity of financial contributions to family).

### B.)   Donahue Plaintiffs

The Donahue plaintiffs' economist, Harold Petersen, started with the fact that Mr. Donahue was a member of the Teamster's Union (as was Mr. Halloran and many members of the Winter Hill gang), and calculated the net loss to the Estate based on the amount a Teamster, working full-time throughout the years in question, would have earned.  Plaintiff Ex. 9.  Dr. Petersen provided alternative total loss amounts to the Estate, based on varying factors, from approximately $1 million to $2.2 million.

There are several fundamental flaws in Dr. Petersen's calculations, the first three of which were pointed out by the Court during his testimony.  First, Dr. Petersen estimated "Mr. Donahue's net income over his work life," not the net economic benefits to the survivors.  Tr. 3-58 - 3-60.  Second, Dr. Petersen assumed that the survivors would "have the benefit of Mr. Donahue's earnings for the full time that he's able to earn money," i.e., the witness made no effort to adjust the calculation for the children reaching adulthood, moving out of his home and/or earning their own income.  *Id.*  Third, in several of Dr. Petersen's estimates (1A, 2A and 3A) he failed to deduct the amount the deceased would have paid in state and federal taxes.  Tr. 3-20.  In response to the Court's inquiry, he conceded that such a deduction should be made in a death case.  Tr. 3-20.  Because the FTCA permits recovery only for compensatory damages, income taxes should be subtracted from gross income in the calculation of damages. *See Felder v. United States*, 543 F.2d 657, 670 (9th Cir. 1976) (failure to deduct for taxes deemed an award

of punitive damages); *see also, Shaw v. United States*, 741 F.2d 1202, 1206 (9th Cir. 1984);

*Flannery v. United States*, 718 F.2d 108, 111 (4th Cir. 1983), *cert. denied*, 467 U.S. 1226,

(1984); *Harden v. United States*, 688 F.2d 1025, 1029 (5th Cir. 1982); *O'Connor v. United

States*, 269 F.2d 578, 584 (2d Cir. 1959).

Moreover, Dr. Petersen conceded that he used an economic model for projecting lost

income that uses assumptions "designed to benefit the claimants and are more favorable than the

standard assumptions typically applied in litigation." Tr. 3-51.  He also included pre-judgment

interest in his estimates of the deceased's lost income. Tr. 3-55.  Pre-judgment interest against

the United States for a claim arising under the FTCA is prohibited. 28 U.S.C. § 2674; *see Manko

v. United States*, 830 F.2d 831, 837-38 (8th Cir. 1987).[8]

In his testimony, Dr. Petersen described his method of essentially tripling the witness'

lost income in the 1980s so that it has the "purchasing power" of the present.  Tr. 3-55 - 3-56.  In

doing so, he alternately called this multiplier "interest" or "appreciation with inflation" but the

mathematical calculation is the same, as is the legal prohibition against it.  *See, Library of

Congress v. Shaw*, 106 S. Ct. 2957,  2965 (1986) ("the force of the no-interest rule cannot be

avoided simply by devising a new name for an old institution."); *Barrett v. United States,* 660 F.

Supp. 1291, 1319 (S.D.N.Y 1987) ("Whether the adjustment plaintiff requests is called

pre-judgment interest, 'compensation for the time value of money," or "compensation for delay,"

it cannot be allowed because of the express prohibition in Section 2674 of the Act. While the

---

[8]  In the Donahue plaintiffs' trial brief, they cite *Manko* as a case where prejudgment interest was allowed.  The case stands for the opposite proposition.  What was allowed in that case were defined and contracted for lost pension benefits, the equivalent of lost wages, not prejudgment interest. *Manko* at 837.  Plaintiffs' brief also cites three non-FTCA tort cases in support, though those cases are clearly inapposite because the claims were not subject to the FTCA's no-interest rule.

application of Section 2674 may work an injustice in this case, particularly because of the long period during which plaintiff has been deprived of its money because of the Government's wrong, this is an injustice for Congress, not this court, to correct."); *Preston v. United States*, 776 F.2d 754, 760 (7th Cir. 1985) (farmers whose grain had been converted by federal employees not entitled to the value of the use of the grain during 12 years that it was lost).

A more fundamental flaw is Dr. Petersen's assumption of full-time work as a Teamster, which is directly at odds with the deceased's actual work history. Mr. Donahue's Social Security records show income up through 1975, but none from 1975 through his death in 1982.[9] Deft. Ex. 10. His widow conceded that during the marriage she had "no idea how much money Mr. Donahue brought home" or how much money he had. Tr. 1-95. She further conceded that he did not work full-time. *Id.* She explained that the mortgage on their home, and significant living expenses, were often paid by her father in law, Mr. Thomas Donahue, or from her own income. Tr. 1-98 - 1-100 She also told Agent Montanari at the time of her husband's death that Mr. Donahue had been out of work for more than a year. Tr. 4-59. This testimony corroborates the fact Mr. Donahue's actual earnings history was neither full-time nor that of an average Teamster and, accordingly, Dr. Petersen's opinion is fundamentally flawed. Defendant's Exhibit 13 graphically depicts the deep disconnect between Mr. Donahue's actual earnings (which show that the most he ever earned in any one year was $9,800 in 1973) and Dr. Petersen's projected annual earnings for a hypothetical, full-time Teamster (which start in 1982 at $27,414 and increase substantially).

---

[9] Dr. Petersen conceded that such reports, which show historical earnings, are used as a proxy for missing tax returns and typically relied on by economists in calculating future income. Tr. 3-31 - 3-32. But he ignored those reports here.

To the extent the Court would rely on Dr. Petersen's testimony at all, deep reductions highlighted here are necessary before entering an award for lost economic benefits to Mr. Donahue's statutory beneficiaries.

## 2.    Conscious Pain and Suffering of Plaintiffs

In addition to the economic losses of the survivors, "damages may be recovered for conscious suffering resulting from the same injury, but any sum so recovered shall be held and disposed of by the executors or administrators as assets of the estate of the deceased." ALM GL ch. 229, § 6.  To prevail on a claim of conscious suffering, the plaintiff has the burden of demonstrating (1) a period of life between injury and death, and (2)  pain or consciousness of injury.  *Royal Indem. Co. v. Pittsfield Elec. Co.*, 199 N.E. 69, 71 (Mass. App. Ct. 1935). The statute provides little guidance as to specific amounts to be awarded for such injuries, however, there is extensive case law on the issue of the proof required to establish that the deceased actually was conscious of any pain or suffering prior to death.

> To avail the plaintiff, the conscious suffering of G. L. c. 229, § 6, must be demonstrated by cognizable proof beyond mere surmise. *See Baldassare v. Crown Furniture Co.*, 349 Mass. 183, 195, 207 N.E.2d 268 (1965). Here the proof of awareness is null or, on any basis of comparison, not any more demonstrative than that appearing in decisions dismissing claims under § 6, *e.g., Carr v. Arthur D. Little, Inc*., 348 Mass. 469, 474-478, 204 N.E.2d 466 (1965)....Upon a reading of the medical record we agree with the trial judge that the girl lacked consciousness or awareness from beginning to end. If the record could conceivably be read otherwise under expert guidance, the plaintiff offered no expert testimony (the doctors testified as observers not experts).

*[Name Redacted] v. Edwards*, 818 N.E.2d 163, 176 (Mass. App. Ct. 2004)

## A)    Donahue Plaintiffs

The case law restrictions cited above are clearly apposite to the claim of the Donahue Estate for conscious pain and suffering because the evidence shows that he was shot in the head

in the first assault and, as one would expect, there is no reliable evidence that he was conscious of his injury before death from that wound.

Mr. Jamie Parker, who was in a vehicle behind that of the victims, testified that he heard a sound that sounded like a gun shot and then the vehicle drifted off to the side of the road, whereupon more shots were fired into the victims.  Tr. 1-25; Tr. 1-28.  The initial sound caused him to look into the vehicle where he saw the driver's head bobbing, which he termed "dodging the bullets."  *Id.*  After seeing Mr. Donahue's head bobbing while the shots were being fired, Mr. Parker never looked at Mr. Donahue again.  *Id.*

Mr. Vincent DiMauro was a trained Emergency Medical Technician who responded to the scene.  Tr. 2-8.  He testified that due to the obvious severity of the disfiguring trauma to Mr. Donahue's head from the gun shot, he did not treat him at the scene, and went to treat Mr. Halloran instead.  Tr. 2-18 - 2-19.  He testified to no indication that Mr. Donahue was conscious at the scene at any time.  *Id.*  Similarly, EMT Rick O'Brien testified that he observed no indications that Mr. Donahue was conscious.  Tr. 1-43.

Prior to the arrival of medical help, police vehicles arrived at the scene, one of which carried Assistant State's Attorney Thomas McDonough.  He testified that he arrived at the scene within five minutes of the police radio broadcast of the shooting, at a time when only two police officers were present. Tr. 1-59   He observed that Mr. Donahue was "missing a part of his scalp," was "completely unresponsive" and "slumped over the steering wheel column."  *Id.*

The Court also was presented with the testimony of Det. Robert McClain, who responded to the scene.  He testified that he was with Mr. Donahue for "a couple of minutes" before the medical personnel arrived.  Tr. 1-47 - 1-49.  In that time, Det. McClain observed that Mr. Donahue "had what appeared to be a bullet wound through the back of his head."  *Id.*  Det.

McClain attempted to speak to the victim but Mr. Donahue could not respond or make any sounds.  *Id.*  He did not even look at Det. McClain.  *Id.*  Det. McClain opined that Mr. Donahue was "conscious" and he believed the soundless movements of his jaw were attempts to respond to his questions, but that the attempt was unsuccessful because "his mouth was so full of – I believe it was brains."  *Id.*  Because Det. McClain conceded that he has had no medical training, his opinion testimony of consciousness is speculative.  *Id.*

Thus, plaintiffs claim for conscious pain and suffering rests on Mr. Parker's characterization that Mr. Donahue's head was "dodging bullets," notwithstanding that his description more clearly depicts that his head was rebounding from the assault of the bullets. Indeed, the car's drift off to the side of the road, which occurred after Mr. Parker heard a gunshot sound, is strong indication that Mr. Donahue, who was driving, had already been shot and lost consciousness (and control of the vehicle) before Mr. Parker took notice of Mr. Donahue's head "dodging."  The only other evidence for the claim rests on Det. McClain's opinion, shorn of medical training, that Mr. Donahue was "conscious," notwithstanding that he had a gunshot wound to the back of the head and could not respond to his questions at the scene.[10]

The testimony of Det. McClain and Mr. Parker regarding the movements of Mr. Donahue at the scene are clearly aligned with those cases holding that moans, groans, and involuntary movements have generally been found insufficient as evidence of consciousness. *Ghiz v. Wantman*, 149 N.E.2d 595, 597 (Mass. 1958) ("It is a matter of speculation whether the movements of head and lips and the moans and groans were the result of conscious effort and

---

[10]  The first medically-trained witness to the scene, Lt. O'Brien, testified from his observation that Mr. Donahue was not conscious.  Tr. 1-43.

suffering.  Evidence is lacking which would serve to create an issue for a jury.  *See Battany v. Wall*, 232 Mass. 138, 141; *Nadeau v. Taunton*, 247 Mass. 104, 106;  *Isaacson v. Boston, Worcester & New York Street Railway*, 278 Mass. 378, 391-392; *Alden v. Norwood Arena, Inc*. 332 Mass. 267, 273-274.")

Here, "[t]he evidence of conscious action is at most speculative, and does not meet the burden of proof of conscious suffering which is upon the plaintiff, and without which there can be no recovery by the plaintiff."  *Carr v. Arthur D. Little, Inc*., 204 N.E.2d 466, 471 (Mass. 1965) (citations omitted).  At the very least, the question "is enigmatic for nonexpert observers" and plaintiffs lack of interpretive expert medical testimony is a failure of proof.  *Edwards* at 493 fn. 30.  Accordingly, there is an insufficient evidentiary basis for an award for conscious pain and suffering to the Donahue Estate.

    **B).**    **Halloran Claim**

As defendants conceded at trial, based on the testimony presented, Mr. Halloran suffered 32 to 36 minutes of conscious pain and suffering before his death.  Tr. 4-130.  During the Halloran plaintiffs' closing argument, there was discussion of this Court's award of $3 million for conscious pain and suffering in the related *McIntyre* case as a "benchmark" for an award in this case.  Tr. 4-127.  The defendant's survey of awards for conscious pain and suffering under the Massachusetts wrongful death statute, appended as Exhibit 2 to this brief, reveals that the *McIntyre* award is at the most extreme high end for such awards.  Indeed, of the 23 awards for conscious pain and suffering awarded under this statute for other citizens over a 20 year span, only five were for more than $500,000, and only *McIntyre* was greater than $1 million. Moreover, according to the 2005 Massachusetts Verdict Survey, compiled and published by LRP Publications, the average median total award for wrongful death in Massachusetts (including all

elements of damages) is $1.2 million.  2005 Massachusetts Verdict Survey 8 (Brooke J. Doran ed., LRP Publications 2005).  Relevant pages of that survey are attached as Exhibit 3 to this brief.

**3.     Loss of Consortium**

Recovery for a claim of loss of consortium is contingent upon a showing that a dependency relationship between the child and parent was impaired as a result of the defendant's negligence.  *See Barbosa v. Harper Feeds, Inc*., 537 N.E.2d 99, 104 (Mass. 1989).  For the claims of children, the onus is on the child to establish a viable claim for loss of parental society by establishing "filial needs for closeness, guidance, and nurture."  *Id. (quoting Ferriter v. Daniel O'Connell's Sons,* 413 N.E.2d 690, 696 (Mass. 1980).  Moreover, recovery for a child's loss of consortium is limited to the years of the child's minority, unless the child suffers from some unique debilitating condition.  *Morgan v. Lalumiere*, 493 N.E.2d 206, 211 (1986);  *Rodriguez v. Cambridge Hous. Auth.*, 1998 WL 1184158, at 6 (Mass. Super. 1998) ("In order to support a claim for loss of a parent's society and companionship, the plaintiff child must be either a minor or, if adult, have some unique circumstance that makes the adult child intensely and unusually dependent on his parent.")

The Court asked the parties to address in this brief whether the award to the survivors is "an aggregate number...or whether some attempts should be made to allocate the contribution." Tr. 4-129.  The case law indicates it is the former.

> We think it equally clear from the use in § 2 of the words "the amount," denoting the singular, in juxtaposition with the same section's use of the phrases "the persons entitled to receive the damages recovered, as provided in section one" and "the persons entitled to the damages recovered," both denoting the plural, that the claims of  a wife and a child are simply separate ingredients of a single amount which can be recovered by the personal representative of the decedent for the benefit of all the persons who are to share in the recovery in accordance with whatever is the appropriate formula set out in § 1.  Loss of financial support is just another ingredient of that amount. The amount can swell or shrink from case

16

to case, depending on the total number of beneficiaries identified in the relevant formula and the damages sustained by each, but when all is said and done, the person responsible for the death is liable under § 2 for only a single, indivisible amount.

*Doyon v. Travelers Indem. Co.*, 493 N.E.2d 887, 889 (Mass. App. Ct. 1986).

### A.)    Donahue Plaintiffs

Mrs. Donahue and her sons testified at trial as to the losses they suffered as a result of the death of Mr. Donahue.  There is no dispute in this case that there is an evidentiary basis for the Donahues' loss of consortium claim.  Judge Gertner of this Court, in her recent survey of loss of consortium awards to children for wrongful death of a parent, settled on $200,000 as the proper measure for the loss of a father to minor children.  *Limone v. United States*, 497 F. Supp. 2d 143, 248 (D. Mass. 2007).  That range would appear appropriate for the survivors in the Donahue case.

### B.)    Halloran Plaintiffs

Two years after Mr. Halloran's death,  Mrs. Macarelli testified that she met Police Sergeant Joe Macarelli, who married her and has given her and her children "excellent" care and support up to the present time.  Tr. 3-96.  The Court asked the parties to address whether the facts regarding Mrs. Macarelli's subsequent remarriage would affect her recovery in this matter.  Tr. 4-129.  The case law indicates that it would not support a claim for formal mitigation of damages. *Estate of Spinosa.*  621 F.2d 1154, 1159 (1st Cir. 1980).  However, the contrast of the two relationships is still quite revealing in this context.

During his brief marriage to Mrs. Macarelli, Mr. Halloran lived a violent life, during which he used cocaine regularly.  Tr. 3-93.  Mrs. Macarelli conceded that he was never legitimately employed and that he was not open with his wife.  Tr. 3-92.  When asked if, during

the marriage, Mr. Halloran made dinner, did laundry or paid bills for the family, Mrs. Macarelli

answered, "No, God, no." Tr. 3-94.  He did not do handyman work around the house, nor did he

babysit his own children.  Tr. 3-95.  Not only did he provide little support, her life was

endangered simply by being around him.  Tr. 3-96.

Mr. Halloran's two sons, asserted no claim and provided no testimony during trial as to

any filial losses they may have incurred from the loss of Brian Halloran as a father.   *Barbosa v.*

*Hopper Feeds, Inc*., 537 N.E.2d 99 (Mass. 1989) is instructive on this claim.  In *Barbosa*, the

plaintiffs presented no evidence as to the child's filial needs for closeness, guidance, nurture, or

any other dependence on the injured parent.  *Id.* at 104.  Nor was any evidence presented of a

causal relationship between the injury and any impairment of the plaintiff child's dependence.

*Id*. at 105.  *Barbosa* unequivocally places the burden on the child to establish the relationship and

failure to present evidence in this regard warranted denial of any recovery for loss of parental

consortium.[11] *Accord*, *Gottlin v. Graves,* 662 N.E.2d 711, 715 (Mass. App. Ct. 1996) ("the

plaintiff carries the burden of proving the existence, and impairment, of a dependency

relationship between the child and parent in a loss of consortium claim.")  The Halloran children

did not, indeed could not, establish any basis for a claim for compensation for a lost relationship

with Brian Halloran.

While Mrs. Macarelli did assert such a claim for a loss of society and consortium with

Mr. Halloran, compensation for that loss would have to be at the lowest end of any reasonable

range for such losses.  The loss of her brief relationship with Mr. Halloran led her to an abiding

---

[11]  *Barbosa v. Hopper Feeds, Inc*., 404 Mass. 610, 619 (Mass. 1989) ("We can only speculate why no such facts were offered here by plaintiffs' counsel: either such facts are not available or the claim of [the minor child] for damages was regarded by plaintiffs' counsel as relatively less significant than the claims of the other plaintiffs.

and rewarding relationship with Sergeant Macarelli, who cared deeply and well for her and her sons. Tr. 3-96.  While her subsequent marriage may not be used to diminish the award for the loss of her relationship with Mr. Halloran, the quality of the care, comfort and support she derived from it contrasts sharply with that provided by her brief relationship with Mr. Halloran. An award for the loss of that relationship must necessarily be extremely low, or all healthy relationships are devalued.

## **CONCLUSION**

The award of damages as are just rests within the sound judgment of this Court. Accordingly, the defendant, United States of America, asks the Court to consider these points and authorities in reviewing the record and entering its final award of damages for plaintiffs.


///


///


///


///


19

Respectfully submitted,

JEFFREY S. BUCHOLTZ
Acting Assistant Attorney General

PHYLLIS J. PYLES
Director, Torts Branch

MARY M. LEACH
Assistant Director, Torts Branch

 /s/Lawrence Eiser
LAWRENCE EISER
ANDREW KAPLAN
Trial Attorneys, Torts Branch
Civil Division
U.S. Department of Justice
P.O. Box 888,  Benjamin Franklin Station
Washington, DC  20044
(202) 616-4260
(202) 616-5200 (FAX)

Attorneys for the United States of America

Dated: April 3, 2008

## CERTIFICATE OF SERVICE

I hereby certify that the foregoing was filed through the ECF system and will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent via first-class mail to non-registered participants.

 /s/ Lawrence Eiser
            LAWRENCE EISER