# EXHIBIT A

# United States Court of Appeals
## For the First Circuit

Nos.  09-1950
      10-1766

PATRICIA DONAHUE, INDIVIDUALLY AND IN HER CAPACITY
AS ADMINISTRATRIX OF THE ESTATE OF MICHAEL J. DONAHUE;
MICHAEL T. DONAHUE; SHAWN DONAHUE; AND THOMAS DONAHUE,
Plaintiffs, Appellees,

v.

UNITED STATES OF AMERICA,
Defendant, Appellant.

———————————————

Nos.  09-1951
      09-1952

THE ESTATE OF EDWARD BRIAN HALLORAN, BY PATRICIA MACARELLI,
IN HER CAPACITY AS ADMINISTRATRIX OF THE ESTATE,
Plaintiff, Appellee/Cross-Appellant,

v.

UNITED STATES OF AMERICA,
Defendant, Appellant/Cross-Appellee.

———————————————

### JUDGMENT
Entered:  February 10, 2011

     This cause came on appeal from the United States District Court for the District of
Massachusetts and in accordance with the opinion issued this day, it is now here ordered, adjudged
and decreed as follows:  The district court's denial of the government's motions to dismiss is
reversed, and the matter is remanded to the district court with instructions to vacate the judgments
previously entered and to enter judgment in favor of the United States in each case.  Cross-appeal
(No. 09-1952) is dismissed as moot.  All parties shall bear their own costs.

                                    By the Court:
                                      /s/ Margaret Carter, Clerk

cc: Hon. William G. Young, Ms Sarah Thornton, Clerk, United States District Court for the district
of Massachusetts, Mr. Meier, Mr. Matthews, Mr. George, Mr. Mazzone, Mr. Brown, Ms. Lipscomb,
Mr. Eiser, Mr. Mullane, Mr. Weigand, Ms. Leach, Mr. Hinchey, Mr. Morrris, Mr. Levy, Mr.
Schieffelin, Mr. Bondy and Mr. Christie.

# United States Court of Appeals
## For the First Circuit

Nos. 09-1950
     10-1766

PATRICIA DONAHUE, INDIVIDUALLY AND IN HER CAPACITY
AS ADMINISTRATRIX OF THE ESTATE OF MICHAEL J. DONAHUE;
MICHAEL T. DONAHUE; SHAWN DONAHUE; AND THOMAS DONAHUE,
Plaintiffs, Appellees,

v.

UNITED STATES OF AMERICA,
Defendant, Appellant.

———————————

Nos. 09-1951
     09-1952

THE ESTATE OF EDWARD BRIAN HALLORAN, BY PATRICIA MACARELLI, IN
HER CAPACITY AS ADMINISTRATRIX OF THE ESTATE,
Plaintiff, Appellee/Cross-Appellant,

v.

UNITED STATES OF AMERICA,
Defendant, Appellant/Cross-Appellee.

———————————

APPEALS FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS
[Hon. William G. Young, U.S. District Judge]

———————————

Before
Torruella, Selya and Howard,
Circuit Judges.

———————————

    Jonathan H. Levy, Attorney, Appellate Staff, Civil Division,
United States Department of Justice, with whom Tony West, Assistant
Attorney General, and Thomas M. Bondy, Attorney, Appellate Staff,
were on brief, for the United States.
    Edward T. Hinchey, with whom Nicholas W. Schieffelin and
Sloane & Walsh, were on brief, for Donahue appellees.
    William E. Christie, with whom Shaheen & Gordon, P.A. was on

brief, for Estate of Edward Brian Halloran.

---

February 10, 2011

---

**SELYA, Circuit Judge.** These are the latest in a series of civil cases arising out of the unholy alliance between the Federal Bureau of Investigation (FBI) and a notorious mobster, James J. "Whitey" Bulger. In this chapter of the sordid saga, the estates and heirs of two men killed on Bulger's orders sued the United States under the Federal Tort Claims Act (FTCA) for leaking confidential information to Bulger and enabling his reign of terror. The proceedings below culminated in multi-million-dollar judgments for the plaintiffs. The principal issue on appeal is whether the suits were timely filed.

Two different district judges answered this question in the affirmative. Since then, this court has passed upon the timeliness issue in a number of similar cases and refined the legal doctrines that inform the decisional calculus. In fidelity to this intervening authority, we conclude that the suits were not timely filed and, therefore, reverse. We do so, however, without endorsing the FBI's conduct, which we regard as reprehensible.

**I. BACKGROUND**

The tawdry tale of the FBI's corrupt collaboration with Bulger and his sidekick, Stephen "the Rifleman" Flemmi, has been recounted many times. See, e.g., Rakes v. United States, 442 F.3d 7, 11-17 (1st Cir. 2006); Callahan v. United States, 426 F.3d 444, 446-50 (1st Cir. 2005); McIntyre v. United States, 367 F.3d 38, 40-51 (1st Cir. 2004); see generally United States v. Salemme, 91 F.

- 3 -

Supp. 2d 141 (D. Mass. 1999), rev'd, United States v. Flemmi, 225 F.3d 78 (1st Cir. 2000). We assume the reader's familiarity with this compendium of cases and rehearse here only those facts necessary to bring these appeals into focus.

### A. **The Axis of Evil**.

For decades Whitey Bulger, a key figure in organized crime circles in Boston, and the leader of a criminal syndicate known as the Winter Hill Gang, led a double life. Unbeknownst to his counterparts in crime, he served as a confidential informant for the FBI. Bulger's underworld position made him privy to various and sundry activities of rival gangs, including the Mafia (sometimes known as La Cosa Nostra). The FBI's ardent desire to bring the Mafia to heel led it to make a Faustian bargain: in exchange for information about Mafia activities, the FBI would protect Bulger and Flemmi and "look the other way" as the duo pursued their own felonious misadventures. This alliance spanned three decades, lasting from the late 1970s well into the 1990s.

John Connolly, a member of the FBI's organized crime unit, was tasked to "handle" Bulger and Flemmi. Connolly and Bulger had grown up in the same South Boston neighborhood. John Morris, who for most of the relevant period headed the organized crime unit in the FBI's Boston office, oversaw Connolly.

Over time, Bulger and Flemmi plied their FBI handlers with assorted gratuities. See, e.g., United States v. Connolly,

504 F.3d 206, 210 (1st Cir. 2007); <u>Salemme</u>, 91 F. Supp. 2d at 210.
More importantly, they provided a cornucopia of high-quality
information that led to the convictions of several Mafia hierarchs.
These convictions were a gift that kept on giving: they enhanced
the informants' value to the FBI, decimated a powerful rival of the
Winter Hill Gang, and created a vacuum that Bulger and Flemmi
systematically exploited.

Not surprisingly, the FBI coveted Bulger and Flemmi and
considered them "Top Echelon" informants. <u>See Flemmi</u>, 225 F.3d at
81 (describing the FBI's "Top Echelon" informant program). Because
this characterization elevated the status of their handlers,
Connolly and Morris did everything in their power, whether legal or
illegal, to protect their prized informants and keep them happy.
In the bargain, the agents blithely ignored FBI guidelines and
permitted Bulger and Flemmi to carry out a constellation of
criminal activities, ranging from loan-sharking to extortion to
murder.

### B.  **The Murders**.

The FBI's protective efforts extended as far as
discouraging other law enforcement agencies from investigating
crimes committed by Bulger and Flemmi; notifying the pair of
planned law enforcement activities; and leaking to them the
identities of persons who came forward with incriminating

information related to their malefactions.  We focus here on one such informant: Edward "Brian" Halloran.

Halloran was a low-level hoodlum, who functioned primarily as a cocaine dealer.  At times, he worked with the Winter Hill Gang.  A life of crime typically has twists and turns and, in January of 1982, Halloran was facing a state murder charge.

This development brings front and center a different murder — the murder of Roger Wheeler.  Wheeler's killing stemmed from a disagreement over a string of Connecticut-based Jai Alai parlors owned by him and managed by John Callahan (who had ties to the Winter Hill Gang).  Wheeler suspected Callahan of skimming money, cashiered him, and commissioned an audit.  Wheeler was gunned down shortly thereafter.

Seeking immunity from prosecution, Halloran offered to share with the FBI information about Wheeler's murder.  He indicated that Bulger, Flemmi, and Callahan had conspired to kill Wheeler and had offered Halloran the contract.  When he declined, Bulger had Wheeler killed by someone else.

In evaluating Halloran's proposal, his FBI handlers had asked Morris about Halloran's reliability.  Because it was the FBI's policy to "close" informants who were themselves under investigation, Morris and Connolly (with whom he consulted) feared that Halloran's allegations would lead the FBI to terminate its partnership with Bulger and Flemmi.  Rather than run that risk,

Morris responded (without any foundation in fact) that Halloran was untrustworthy. On the basis of this mendacity, the FBI rejected Halloran's offer to turn traitor and denied his request to be put into its witness protection program.[1]

Even though Halloran's charges had been defused, word of his perfidy made its way from Morris to Connolly to Bulger. Morris and Connolly, who were both experienced agents steeped in the mores of organized crime, must have realized that disclosure of Halloran's identity and allegations not only violated FBI guidelines but also jeopardized Halloran's safety. That jeopardy materialized: shortly after Connolly leaked Halloran's identity to Bulger, Bulger and Flemmi hatched the plot to eliminate Halloran.

On May 11, 1982, Halloran asked his neighbor, Michael Donahue, for a ride home. Donahue, in what later would prove to be a costly gesture of good will, agreed. As they drove, Bulger's car pulled alongside and a fusillade of shots followed. Donahue died immediately; Halloran tried to flee, sustained a myriad of gunshot wounds, survived for a short period of time, identified James "Jimmy" Flynn (a Winter Hill associate) as his assailant during the

---

[1] As matters turned out, Halloran's charges later proved to have a basis in fact. A Winter Hill associate, John Martorano, subsequently pleaded guilty to Wheeler's murder. See McIntyre, 367 F.3d at 50. Several months after Wheeler's execution, Martorano, acting on Bulger's orders, also murdered Callahan. See Callahan, 426 F.3d at 449.

Case 1:01-cv-10433-WGY     Document 259-1     Filed 02/06/12     Page 10 of 59

ambulance ride, and was pronounced dead upon arrival at a local hospital.

The murders of Halloran and Donahue, along with Bulger's possible role in the Wheeler and Callahan slayings, presented the FBI with a dilemma. FBI offices outside of Boston, as well as state law enforcement agencies, were investigating Bulger's and Flemmi's potential involvement in the murders of Wheeler, Halloran, Donahue, and Callahan (which had long been thought to be related). If given credence, Halloran's allegations would have shed light on Bulger's participation and, quite possibly, would have led the FBI to "close" him as an informant.

FBI agents from the Boston office's organized crime unit, including Connolly and Morris, met to discuss the situation. They decided to retain Bulger and Flemmi as informants unless and until they received "substantial information" implicating the men in the murders.[2] Then, in a cynical twist, the agents took an active role in preventing any such "substantial information" from surfacing. Their actions included hindering attempts by other FBI offices to solve the Wheeler and Callahan murders; furnishing information about pending investigations to Bulger and Flemmi; failing to index documents summarizing Halloran's charges; and prohibiting

---

[2] Although Flemmi was briefly "closed" as an informant, he continued to furnish information to Connolly and Connolly continued to leak confidential information to him, including the name of John McIntyre, another confidential informant whom Bulger and his henchmen subsequently murdered. See McIntyre, 367 F.3d at 46-47.

interviews of Bulger and Flemmi.  They also made certain that no information about Bulger's role in Halloran's murder was revealed to the Massachusetts authorities.

In 1985, the Suffolk County (Mass.) District Attorney prosecuted Flynn for the Halloran and Donahue murders.  Flynn proclaimed his innocence and went to trial — a trial that members of the Donahue family attended.  The jury acquitted Flynn and the murders remained unsolved for the next decade.

### C.  **The Revelations**.

Bulger's cozy arrangement with the FBI began to unravel in 1992.  The United States Attorney for the District of Massachusetts empaneled a grand jury that eventually handed up indictments against numerous gangland crime figures, including Bulger, Flemmi, and Francis P. "Cadillac Frank" Salemme (the reputed "boss" of the Patriarca crime family).  Although Connolly was no longer working for the FBI at that point, he found out about the indictments before they were unsealed and forewarned Bulger and Flemmi.  Bulger fled and remains a fugitive; Flemmi was not as quick on his feet; the authorities arrested him in January of 1995.

In the judicial proceedings that ensued, Flemmi made a claim of immunity from prosecution based on his role as an FBI informant.  Along this line, he contended that the FBI authorized him to engage in various crimes charged in the indictment.  The district court decided to take evidence on Flemmi's motion.  These

proceedings (which we shall call "the Salemme hearings") started in January of 1998, lasted almost a year, and produced over 17,000 pages of transcripts.

As part of the Salemme hearings, Morris testified under a grant of immunity on April 22, 1998. His testimony brought the FBI's clandestine relationship with Bulger and Flemmi into the public domain. He confirmed that both men were regarded by the FBI as Top Echelon informants. In connection with the Halloran and Donahue murders, he admitted that he falsely told other FBI agents that Halloran was an unreliable witness, thus ensuring that Halloran's allegations would be discounted and that Halloran would be denied entry into the witness protection program. He also told Connolly about Halloran's offer to incriminate Bulger, notwithstanding his knowledge that this leak would endanger Halloran.

Morris further testified that Connolly had leaked Halloran's identity to Bulger and that he (Morris) suspected that Bulger and Flemmi were responsible for Halloran's demise. In what can best be described as locking the barn door once the horse has galloped away, Morris stated that, after the double murder of Halloran and Donahue, he told Connolly that he "did not want

another Halloran" the next time that the FBI tipped off Bulger and Flemmi about an informant's identity.[3]

Three additional pieces of information that came to light during the Salemme hearings are of particular pertinence for present purposes. First, on May 27, 1998, former federal prosecutor William Weld recounted a conversation that he had with Robert Fitzpatrick a few days prior to Halloran's assassination. At the time of this exchange, Fitzpatrick (second in command of the FBI's Boston office) told Weld that Halloran was in grave danger. Fitzpatrick recounted that he "would not want to be standing next to this guy [Halloran]."

Second, in August of 1998, testimony in the Salemme hearings revealed that, in 1988, an incarcerated drug dealer named Joseph Murray told FBI agents that Bulger was responsible for Halloran's murder and that someone in the FBI's Boston office was leaking confidential information to Bulger. Murray's account was neither shared with the agents who were investigating Halloran's murder nor indexed in the FBI's data bank (thus making its retrieval difficult, if not impossible). Third — and perhaps most telling — Flemmi himself made statements to the district court

---

[3] Although Connolly publicly decried Morris's allegations, he never testified at the hearings, choosing instead to invoke his Fifth Amendment right against self-incrimination. Connolly was later convicted on a gallimaufry of charges stemming from his corrupt relationship with Bulger and Flemmi, including charges arising out of Halloran's murder. See United States v. Connolly, 341 F.3d 16, 20-21, 25 n.4 (1st Cir. 2003).

- 11 -

indicating that he had been tipped off by the FBI about Halloran's overtures, his identity, and his role as a potential accuser. These statements were made in a chambers conference that occurred sometime before September 1, 1998 (the date on which the district court revealed them in the course of a ruling).

Word of the corrupt relationship between the FBI and the two notorious mobsters made news. The appendix to this opinion presents a chronological sampling of the most relevant newspaper articles.

As early as 1997, journalists were speculating about Halloran's involvement with the Wheeler murder and Bulger's status as a snitch. See, e.g., Shelley Murphy, In '80s FBI Saw Bulger as Both Informant and Murder Suspect, Bos. Globe, Oct. 3, 1997, at A1. For example, a front-page article in the Boston Herald suggested that the FBI continued to use Bulger and Flemmi as informants even though they were suspects in Halloran's execution. See Ralph Ranalli, FBI Used Whitey, Despite His Ties to 3 Murders, Bos. Herald, July 1, 1997, at 1.

Morris's sensational testimony led to an avalanche of news stories. His admissions that he had told Connolly about Halloran, that Connolly had leaked Halloran's identity to Bulger, and that he suspected Bulger of killing Halloran were widely reported in both the local and national press. See, e.g., Peter Gelzinis, 'Good' Guys Weren't Good to Halloran, Bos. Herald, Apr.

23, 1998, at 6; Shelley Murphy, <u>Worst Fears Came True as Informant</u> <u>Lost Race for His Life</u>, Bos. Globe, Apr. 23, 1998, at B10.  The two most widely circulated Boston-area newspapers — the Boston Globe and the Boston Herald — covered these disclosures in laborious detail, often with gripping headlines and prominent placement. <u>See</u>, <u>e.g.</u>, Ralph Ranalli, <u>Ex-FBI Honcho: Agent Tipped Mobsters on</u> <u>Stoolie</u>, Bos. Herald, Apr. 23, 1998, at 1; Patricia Nealon, <u>Ex-</u> <u>Agent Says He Told of Informer[:] Fringe Gangster Turned Up Dead</u>, Bos. Globe, Apr. 23, 1998, at B1.  The intense publicity continued for several months, frequently reiterating Morris's testimony. Some articles included Halloran's photograph.  <u>See</u>, <u>e.g.</u>, Shelley Murphy, <u>Cases Disappear as FBI Looks Away</u>, Bos. Globe, July 22, 1998, at A1; Ralph Ranalli, <u>Whitey Taunted Fed About Slain Stoolie</u>, Bos. Herald, May 16, 1998, at 15.

Subsequent developments in the Salemme hearings were thoroughly reported by the Boston media.  Weld's suggestion that the FBI knew about the leak of Halloran's identity before the murder generated front-page coverage.  <u>See</u>, <u>e.g.</u>, Ralph Ranalli, <u>FBI's Mafia Bugs in Peril — Key Wiretap Requests May Have Contained</u> <u>False Info, Weld Testifies</u>, Bos. Herald, May 28, 1998, at 1. Similarly, Murray's un-investigated allegations were reported. <u>See</u>, <u>e.g.</u>, Patricia Nealon, <u>Witness: FBI Let Languish a Tip Tying</u> <u>Bulger to Murder</u>, Bos. Globe, June 4, 1998, at F8; Ralph Ranalli, <u>FBI Was Allegedly Told of Bulger Role in Murder</u>, Bos. Herald, June

- 13 -

4, 1998, at 4. Flemmi's acknowledgment that he had been tipped about Halloran's perfidy was likewise grist for the journalistic mills. See, e.g., Patricia Nealon, Mob Trial Judge Orders Flemmi to Answer Some Questions, Bos. Globe, Sept. 2, 1998, at B2; Ralph Ranalli, Flemmi Admits Tip-Off to Informant's Identity, Bos. Herald, Sept. 2, 1998, at 6. Along the way, these press dispatches reiterated time and again the corrupt Bulger-FBI linkage and its tragic consequences for Halloran and Donahue. See, e.g., Patricia Nealon, Ground Rules for Flemmi Grilling Eyed, Bos. Globe, June 25, 1998, at B4; Ralph Ranalli, Questions Arise Over FBI Agent's Knowledge of Slaying, Bos. Herald, Aug. 5, 1998, at 1.

Given the astonishing nature of Morris's allegations, it is unsurprising that media outlets other than the Boston newspapers covered this matter. For example, CNN's broadcast "CNN Impact" reported on March 15, 1998, "that Bulger and Flemmi were FBI informants and that possible connections existed between Bulger and Flemmi and the murders of Wheeler, Halloran, and Callahan." Callahan, 426 F.3d at 448. An episode of the news program "60 Minutes," which CBS aired on May 10, 1998, described the FBI's complicity in the murders. Additionally, the telecast displayed photographs of the Halloran crime scene and stated that detectives investigating the Wheeler, Halloran, and Callahan murders "believe all three murders remain unsolved because Bulger and Flemmi were protected by the FBI." And although the government has not

supplied a reliable inventory of local television and radio broadcasts, it would strain credulity to think that local stations would not have feasted upon such tasty fare.

The Salemme hearings concluded in October of 1998. The pièce de résistance was a comprehensive opinion, released by Judge Wolf on September 15, 1999. See Salemme, 91 F. Supp. 2d 141. The opinion itself was covered in depth by the local press, which rehashed the underlying facts in detail. The plaintiffs concede that they learned about this opinion at or near the time when it was issued.

D.  **Travel of the Cases**.

Halloran's estate filed an administrative claim against, inter alia, the FBI on September 25, 2000. Patricia Donahue, acting both individually as the decedent's wife and as administratrix of his estate, along with her three sons, submitted their administrative claim on March 29, 2001. The government failed to satisfy any of the claims and, after the passage of each respective six-month period, see 28 U.S.C. § 2675(a), the plaintiffs sued separately.

The United States was substituted as the party defendant in each action. See id. § 2679. The government moved to dismiss the Donahue case, asserting that the plaintiffs' claims were barred by the FTCA's two-year limitations period. The government averred that the causes of action accrued in April of 1998, when Morris

- 15 -

testified at the Salemme hearings.  The district court, operating without the benefit of a series of opinions subsequently handed down by this court, see, e.g., Patterson v. United States, 451 F.3d 268, 269 (1st Cir. 2006); Rakes, 442 F.3d at 11; Callahan, 426 F.3d at 445; Cascone v. United States, 370 F.3d 95, 96 (1st Cir. 2004); McIntyre, 367 F.3d at 40; Skwira v. United States, 344 F.3d 64, 67 (1st Cir. 2003), denied the motion.  The court relied heavily on two factors: the "considerable span of time" that passed between the murders and the Salemme hearings, and the fact that Flynn was indicted and tried for the homicides.  Donahue v. FBI, 204 F. Supp. 2d 169, 177-78 (D. Mass. 2002) (Lindsay, J.).

    The government's motion to dismiss in Halloran suffered a similar fate.  Relying on Donahue, a different district judge denied the motion.  Estate of Halloran v. United States, No. 01-11346 (D. Mass. June 25, 2002) (Gertner, J.) (unpublished order).

    In due course, the actions were consolidated before Judge Lindsay, who granted partial summary judgment for the plaintiffs with respect to liability.  Judge Lindsay held a bench trial on the issue of damages, but passed away before resolving the matter.  The cases were reassigned to Judge Young, who awarded the Halloran estate $2,061,000 and the Donahue family $6,335,100.  These timely appeals followed.  In them, the government takes aim at the denial of its motions to dismiss.  The Halloran estate cross-appeals from the award of damages, deeming it too low.

- 16 -

## II. **ANALYSIS**

For ease in exposition, we divide our analysis into six segments.  We start with an overview of the FTCA's claim-filing provisions.

### A.  **The FTCA**.

Writ large, the doctrine of sovereign immunity bars the maintenance of any tort claim against the federal government.  FDIC v. Meyer, 510 U.S. 471, 475 (1994); Román-Cancel v. United States, 613 F.3d 37, 41 (1st Cir. 2010).  Congress created a limited waiver of this immunity when it enacted the FTCA, 28 U.S.C. §§ 1346(b), 2671-2680, which allows suits against the United States for personal injuries, death, or property damage "caused by the negligent or wrongful act . . . of any employee of the Government while acting within the scope of his office or employment."  Id. § 1346(b)(1).  As part and parcel of this waiver, the FTCA establishes firm filing requirements for both administrative claims and lawsuits.  Courts must faithfully enforce these requirements, neither "extend[ing] the waiver beyond that which Congress intended [nor assuming] authority to narrow the waiver."  United States v. Kubrick, 444 U.S. 111, 118 (1979).

An FTCA claim must first be presented to the affected agency.  28 U.S.C. § 2675(a).  This must be done promptly: the FTCA builds in a statute of limitations forever barring any "tort claim against the United States . . . unless it is presented in writing

- 17 -

to the appropriate Federal agency within two years after such claim accrues." Id. § 2401(b). These appeals hinge on the temporal parameters of this claim-filing requirement.

As said, the Halloran estate filed its administrative claim on September 25, 2000. The Donahues followed suit on March 29, 2001. Thus, if the Hallorans' claim accrued prior to September 25, 1998 (that is, more than two years prior to the claim-filing date), the action founded upon it is time-barred. For the Donahues, the critical accrual date is March 29, 1999. We frame the dispositive question as whether the plaintiffs' claims accrued earlier than September 25, 1998. After all, the relevant facts for calculating the accrual date are nearly identical for both sets of claimants, so if the first-filed (Halloran) claim is time-barred, the later-filed (Donahue) claim is time-barred as well.

## B. **Standard of Review**.

Before we attempt to determine the precise moment at which the plaintiffs' claims accrued, we acknowledge the applicable standard of review. The government moved for dismissal under Federal Rule of Civil Procedure 12(b)(1). The district court examined a variety of raw facts (mostly uncontroverted) and concluded that, as a matter of law, "it was not unreasonable for the plaintiffs to have failed to discover the factual basis for their claims until after March 30, 1999." Donahue, 204 F. Supp. 2d at 177. Although appellate review of Rule 12(b)(1) dismissals

- 18 -

sometimes requires deference to the trial court, see, e.g.,
Valentín v. Hosp. Bella Vista, 254 F.3d 358, 365 (1st Cir. 2001),
these appeals involve only the objective reasonableness of the
plaintiffs' failure to discern at an earlier time both their injury
and its likely cause.  That is a question of law.  See Skwira, 344
F.3d at 72 (explaining that the ultimate conclusion regarding
timeliness of FTCA claims presents a question of law).
Consequently, we review the orders of dismissal de novo.  See
Rakes, 442 F.3d at 20; Callahan, 426 F.3d at 451.

## C. **The Discovery Rule**.

An FTCA claim generally accrues at the time of the
injury.  McIntyre, 367 F.3d at 51; González v. United States, 284
F.3d 281, 288 (1st Cir. 2002).  In certain settings, however,
either the injury itself or its cause is not readily apparent.  In
Kubrick, the Supreme Court fashioned a narrow exception to address
such circumstances.  The Court held, in the medical malpractice
context, that under this "discovery rule" a claim accrues when a
plaintiff knows (or is chargeable with knowledge) of both the
existence and the cause of her injury.  444 U.S. at 122.  The rule
protects "plaintiffs who are blamelessly unaware of their claim
because the injury has not yet manifested itself or because the
facts establishing a causal link between the injury and [the
tortious act] are in the control of the tortfeasor or otherwise not
evident."  Díaz v. United States, 165 F.3d 1337, 1339 (11th Cir.

- 19 -

1999); see González, 284 F.3d at 289 ("Once a plaintiff knows of the injury and its probable cause, [she] bears the responsibility of inquiring . . . about whether [she] was wronged and should take legal action.").

We have applied the discovery rule in other circumstances in which the injury, its cause, or both are latent. See, e.g., Attallah v. United States, 955 F.2d 776, 780 (1st Cir. 1992). Other courts of appeals have done the same. See, e.g., Plaza Speedway Inc. v. United States, 311 F.3d 1262, 1270-71 (10th Cir. 2002); Garza v. U.S. Bureau of Prisons, 284 F.3d 930, 934-35 (8th Cir. 2002); Díaz, 165 F.3d at 1339; Kronisch v. United States, 150 F.3d 112, 121 (2d Cir. 1998).

Although the discovery rule delays accrual when it applies, that delay is not indefinite. Accrual starts when a plaintiff knows or reasonably should have known the factual basis for his claim; that is, the existence of his injury and its cause. Patterson, 451 F.3d at 270. This is a two-step progression. Mere knowledge of the injury is not enough. A plaintiff also must understand the "causal connection between the government and her injury." Callahan, 426 F.3d at 451 (citation and internal quotation marks omitted); accord Attallah, 955 F.2d at 780. Once a plaintiff possesses these critical facts, he "is no longer at the mercy of the [putative defendant]." Kubrick, 444 U.S. at 122. At

- 20 -

that juncture, he must act expeditiously or risk abdicating any legal remedy. See id. at 123.

Actual knowledge of the injury and its cause is not necessary for a claim to accrue. Callahan, 426 F.3d at 451; Skwira, 344 F.3d at 78. A plaintiff who is unaware of the factual basis for his claim may be charged with such knowledge based on information that he reasonably should have known or discovered in the exercise of due diligence. McIntyre, 367 F.3d at 52. The frame of reference for evaluating what a reasonable plaintiff should have known or discovered is an objective one. Cascone, 370 F.3d at 104; McIntyre, 367 F.3d at 42.

This approach holds the balance steady and true between an FTCA plaintiff's right to redress and the government's legitimate interest in defeating stale claims. John R. Sand & Gravel Co. v. United States, 552 U.S. 130, 133 (2008); Kubrick, 444 U.S. at 117. It also preserves the timetable created by section 2401, which Congress designed to "ensur[e] that the government is promptly presented with a claim while the evidence is still fresh." Patterson, 451 F.3d at 270. This allows the sovereign to "rest easy after a period of time, knowing that suits for long-past wrongs are barred." Rakes, 442 F.3d at 20; see Skwira, 344 F.3d at 84 (Boudin, C.J., concurring) (noting that statutes of limitation "are framed to work mechanically[, banishing any] arguments about whether there was prejudice from delay").

- 21 -

It follows that the government is entitled to expect that certain facts and data will become known to a reasonable person through "the channels of communication that run among people connected through ties of neighborhood, community, friendship, and family." Rakes, 442 F.3d at 23. When such information achieves a level of local notoriety through, say, its headline-grabbing nature or its wide circulation, knowledge of it can fairly be ascribed to prospective plaintiffs. Id. at 20.

FTCA plaintiffs can be charged with knowing two discrete sets of data: (i) generally available information about the relevant facts and (ii) the likely results of any further inquiry that a reasonable plaintiff, knowing these facts, would undertake. Id.; Callahan, 426 F.3d at 451. These two components are interrelated: if generally available information touching upon a plaintiff's claim is sufficient to cause a reasonable person in the plaintiff's position to inquire further, the results that probably would have come to light through such an investigation must be factored into the accrual calculus. See McIntyre, 367 F.3d at 52. Put another way, the knowledge of facts comprising the first component is imputed to the plaintiffs along with whatever other residuum of knowledge would be dredged up through an exercise of the duty to undertake further inquiry. See Skwira, 344 F.3d at 84 (Boudin, C.J., concurring). Thus, when either the generally available information or the likely outcome of a reasonably

- 22 -

diligent investigation that follows inquiry notice is sufficient to ground a reasonable belief that the plaintiff has been injured and that there is a causal nexus between the injury and some governmental conduct, accrual begins. <u>McIntyre</u>, 367 F.3d at 52.

### D. **The Cause of Action**.

We next examine what effect, if any, the plaintiffs' theory of liability may have on the accrual date.

We begin with bedrock: cases cannot be analyzed in the abstract. A distinct theory of liability helps to explain the relationship between the government and the injury and to screen out facts that are impertinent to the accrual analysis. <u>See</u>, <u>e.g.</u>, <u>McIntyre</u>, 367 F.3d at 57 (treating differently two Bulger-related civil cases because they were based on "fundamentally different legal theor[ies]").

Two theories have sprouted in FTCA cases growing out of Bulger's and Flemmi's corrupt relationship with the FBI. The "emboldening" theory posits that the FBI placed a protective shield around the two mobsters, in effect giving them carte blanche to commit crimes at will. <u>See</u>, <u>e.g.</u>, <u>Rakes</u>, 442 F.3d at 20. In contrast, the "leak" theory focuses on the wrongful disclosure of confidences, such as informants' identities, to the mobsters. <u>See</u>, <u>e.g.</u>, <u>McIntyre</u>, 367 F.3d at 54.

Although a plaintiff may advance multiple theories of causation in a single case, the only relevant theory for accrual

- 23 -

purposes (at least where the two theories grow out of a common nucleus of operative fact) is the one that generates the earlier accrual date. See Callahan, 426 F.3d at 452. The government exhorts us to view the date of accrual through the prism of the emboldening theory, which generates an earlier accrual date. See, e.g., id. In contrast, the plaintiffs argue for viewing accrual through the prism of the leak theory.

In Rakes, we clarified the appropriate mode of analysis for choosing among multiple theories of causation in this kind of case. We cautioned that none of our earlier decisions "should be viewed as setting forth a flat rule." 442 F.3d at 21. Rather, the accrual analysis is case-specific and turns on the circumstances of the particular case. Id.

We need not decide which of the two theories is the proper touchstone for measuring the accrual date. For purposes of this case, we assume, favorably to the plaintiffs, that the later-accruing leak theory controls. Even on that questionable assumption, the plaintiffs' claims are time-barred because those claims accrued no later than September 2, 1998 — more than two years prior to the filing of the earliest claim with the FBI.

We add that, for purposes of accrual, we treat the Halloran and Donahue claims as one and the same. This is consistent with the manner in which the plaintiffs have presented their arguments on appeal. It is also consistent with the facts:

- 24 -

Halloran and Donahue were together during Bulger's murderous attack; and ever since that fateful day their deaths have become inextricably intertwined.

### E.  **The Accrual Date**.

We hold that the plaintiffs' claims accrued no later than September 2, 1998.  We premise this holding on information that was generally available at the time of the Salemme hearings.  Because in this case the generally available information was sufficient to trigger the accrual of the claim on that date, we need not examine the alternate component of the accrual calculus — the information that further inquiry would have revealed.

As said, a claim accrues when the plaintiff knew or reasonably should have known of both his injury and its cause. Here, the murders were open and obvious, so the plaintiffs knew of their injury at that time.  Consequently, we must train the lens of our inquiry on when the plaintiffs acquired information about the government's role in causing the injury.  Although Boston-area newspapers speculated as early as 1996 that Bulger and Flemmi had killed Halloran and that the FBI was complicit, the missing piece of the puzzle was not brought squarely to the forefront of public consciousness until April 22, 1998.  Morris's testimony that day was widely circulated in the avalanche of publicity that followed. As we suggested in an earlier case, that testimony and the

attendant publicity spelled out in exquisite detail the facts needed for accrual.  See Callahan, 426 F.3d at 453.

Morris unequivocally stated that he told Connolly of Halloran's cooperation with the FBI.  He also confirmed that Connolly "had informed Bulger and Flemmi that Halloran was implicating them in Wheeler's murder."  Id.  Morris further acknowledged that, as a result of this leak, "he believed that Bulger and Flemmi may have killed Halloran."  Id.

That conclusion was sufficiently apparent that Morris expressed concern that "he had sent Halloran to his death." McIntyre, 367 F.3d at 58 (noting Morris's testimony).

This explosive testimony was extensively reported by both local and national media.  It was prominently featured in both of the major Boston newspapers.  These articles repeatedly mentioned Halloran by name, usually within their lead paragraphs.  One story even included his name in its headlines.  They tied Halloran's and Donahue's deaths directly to the FBI's misconduct.  By way of illustration, we quote the first two paragraphs of one such exposé:

> In his most explosive testimony, the former head of the organized crime squad of the Boston FBI office said yesterday that he told the agent who handled gangster/informants [Bulger and Flemmi] that another informant had implicated them in the [Wheeler] murder . . . — fully expecting the agent would pass the information along to his two prized snitches.
>
> The informant, fringe gangster Edward "Brian" Halloran, soon turned up dead. . . .  Morris

- 26 -

said he suspected that Bulger and Flemmi were
involved in Halloran's murder.

Nealon, Ex-Agent Says He Told of Informer[:] Fringe Gangster Turned
Up Dead, supra, at B1.

News coverage about the Halloran-Bulger-FBI murder
triangle persisted after Morris testified. Newspapers continued to
report additional tidbits that surfaced during the balance of the
Salemme hearings. These revelations included Weld's testimony,
Murray's allegations, and Flemmi's confession (which was made
public by Judge Wolf on September 1, 1998, and widely publicized
the next day).

The import of these disclosures is unmistakable. Under
the discovery rule as it operates in FTCA cases, irrefutable proof
of a combination of wrongful conduct and government responsibility
for that conduct is not essential. Skwira, 344 F.3d at 85 (Boudin,
C.J., concurring). It suffices if a prospective plaintiff has
enough information to lead a reasonable person in his position to
seek advice about a possible claim against the government.
Kubrick, 444 U.S. at 123; Callahan, 426 F.3d at 451. Morris's
testimony was given under oath and was based upon personal
knowledge. Key aspects of it were corroborated by independent
accounts, most notably by one of the alleged murderers. The
picture painted during the Salemme hearings was widely-reported.
With this information available to them, the plaintiffs had
considerably more than a mere hunch, hint, suspicion, or rumor

- 27 -

about what had transpired. The information called into question the government's responsibility for the Halloran and Donahue murders.

To be sure, there is no direct proof that the plaintiffs had assimilated this information. But whether the plaintiffs actually knew the information is not the issue. What counts is that the body of work was generally available to them no later than September 2, 1998. Accordingly, they are charged with knowing this information on or before that date. On that basis, we find that the combination of Morris's detailed testimony, the other revelations that popped up during the Salemme hearings, and the widespread publicity that accompanied these developments form a solid foundation for charging the plaintiffs with knowledge of the cause of their injury no later than September 2, 1998. At that time, the plaintiffs reasonably should have known of the FBI's possible connection to the murders. They thus had sufficient factual information to start the running of the accrual period.

The plaintiffs resist this conclusion in various ways. First, they suggest that the length of time between the murders and the avalanche of generally available information about the cause of the murders — approximately 16 years — justifies a more lenient application of the discovery rule. We do not agree.

In McIntyre, we dealt with a similar confluence of events, playing out over a comparably protracted interval. That

- 28 -

case involved, inter alia, claims stemming from Wheeler's murder. We concluded that news articles about Morris's testimony "should have caught the Wheelers' attention, because they specifically referenced Roger Wheeler's murder." 367 F.3d at 58. We deemed this extensive reportage sufficient to trigger accrual for the Wheeler family's claims. Id. at 61. Our holding today mirrors that holding.[4]

That ends this aspect of the matter. The widespread publicity given to the Halloran and Donahue murders was enough to trigger accrual, notwithstanding the 16-year gap. See Patterson, 451 F.3d at 271 (finding "widespread publicity" sufficient to overcome 35-year gap).

Second, the plaintiffs insist that the government's repeated attempts to cover up (or at least minimize) its role in Bulger's escapades should militate against accrual in this case. But the government's uncooperative attitude hardly could have shut the spigot on the flow of information; the facts were emerging despite the FBI's recalcitrance. In all events, one need not have irrefutable proof of the government's accountability in order to

---

[4] The same discussion also dealt with claims arising out of the murder of John McIntyre, an FBI informant. The McIntyre plaintiffs' claim was different from that of the Wheeler plaintiffs. Morris's statements never mentioned any leak of McIntyre's identity nor did they offer any clue that McIntyre's death stemmed from Bulger's and Flemmi's corrupt relationship with the FBI. See McIntyre, 367 F.3d at 56. The instant case fits the Wheeler model, not the McIntyre model.

file an administrative claim; it is enough to have "possession of sufficient information for the agency to investigate the claim[]." Skwira, 344 F.3d at 81 (citation and internal quotation marks omitted). Filing such a claim puts at most a modest burden on plaintiffs, who can continue seeking additional corroborative evidence afterward. Id. at 81-82 & n.17 (observing that plaintiffs could "ask[] the agency to hold the claim in abeyance pending the outcome" of ongoing investigations).

The Donahue plaintiffs next advance an argument unique to them. They asseverate that their relocation from Dorchester (a neighborhood in Boston) to Randolph (a Boston suburb) interfered with their exposure to the relevant facts. But the two communities are situated in close proximity to one another, and both are served by the main-line print and electronic Boston media. Under those circumstances, a distance of roughly ten miles is not enough to obstruct the channels of communication that are likely to inform people connected through ties of locale, friendship, and family. See Rakes, 442 F.3d at 23; cf. Patterson, 451 F.3d at 271 (concluding that plaintiff's residence in Georgia was "insufficient to vitiate a finding that she should have learned of the news" of the FBI's involvement in decedent's Boston-based murder). The murder of a husband or father is a traumatic event of immense proportions, likely to raise a person's antennae when news touching upon that murder surfaces.

- 30 -

At any rate, even infrequent communication with family, friends, and former neighbors may give a plaintiff enough knowledge to trigger accrual.  See McIntyre, 367 F.3d at 60-61.  The Donahue plaintiffs far outstripped that minimum level of communication. Despite their move, they remained comfortably within the circumference of widespread news coverage.  Thus, their relocation to a nearby town cannot mitigate the accrual of their claim.

The Halloran plaintiffs also make a separate argument. They suggest that Bulger and Flemmi tried to kill Halloran before he began cooperating with the FBI and that this timing should militate against accrual.  But this argument boomerangs:  if Halloran was killed for a reason other than his informant status, the plaintiffs' claim morphs into the emboldening theory — and, thus, would have an earlier accrual date.  See McIntyre, 367 F.3d at 58.

All the plaintiffs also place weight on Halloran's dying declaration that Flynn was the murderer.  They buttress that declaration by reference to Flynn's subsequent prosecution.  They maintain that their reasonable belief that Flynn was the culprit justified their failure to conduct a diligent investigation after learning of Morris's testimony.[5]

---

[5] The dissent trains the lens of its inquiry on when the plaintiffs had reason to know the identity of the person responsible for the murders.  Dissent Op. at 42-45.  But this focus misses the mark — the relevant inquiry is when the plaintiffs had reason to know of the FBI's leak of Halloran's identity to Bulger

This argument does not withstand scrutiny. The plaintiffs' professed belief may have been reasonable initially, but that rationale was severely undercut, if not wholly extirpated, by Flynn's acquittal, Morris's testimony, Flemmi's admission, and the other new information that emerged in 1998. See Patterson, 451 F.3d at 269, 271. At this juncture, Flynn's acquittal took on added significance.

Patterson bears an eerie resemblance to this case. There, FBI agents knew beforehand of an informants' plans to slaughter another person. Id. at 269. Yet, they took no steps either to forestall the murder or to head off an accusation against two innocent men. Id. Despite a wrongful conviction, we found that an FTCA claim proffered on behalf of the murder victim began to accrue based on the "breaking news" about FBI corruption. Id. at 271. The instant plaintiffs lack even the evanescent firmness of a wrongful conviction and, thus, cannot rely on the specter of Flynn to justify their delay. Cf. Skwira, 344 F.3d at 80 (concluding that claim accrued when, among other factors, government asked family's permission to exhume body and family was told that the listed cause of death was incorrect).

Finally, all the plaintiffs assert that they were not chargeable with knowledge of the cause of the injury until the

---

and Flemmi. After all, this is a suit which alleges wrongful disclosure, not wrongful death.

publication of Judge Wolf's opinion in <u>Salemme</u>.    Although this opinion wrapped all the pieces of the puzzle in a neat package, the pieces themselves were readily available at an earlier date.    The plaintiffs fail to explain why there should be any distinction between the well-publicized information that surfaced during the Salemme hearings and its recapitulation in the district court's opinion.    While the latter was a more orderly and comprehensive presentation, the facts relevant to the government's responsibility for the Halloran and Donahue murders were identical in both.

### F.  <u>Equitable Tolling</u>.

In a last-ditch effort to salvage a favorable judgment, Halloran's estate argues that the accrual period should be equitably tolled because of the government's fraudulent concealment of information about the corrupt relationship and the leak.    There is some authority for such an approach: in <u>Rakes</u>, we noted, albeit in dictum, that equitable tolling based on fraudulent concealment is feasible in an FTCA case.    442 F.3d at 26.    Nevertheless, that channel is not navigable here.

Due diligence is a prerequisite for equitable tolling. <u>See Beltre-Veloz</u> v. <u>Mukasey</u>, 533 F.3d 7, 11 (1st Cir. 2008) ("It cannot be gainsaid that due diligence is a sine qua non for equitable tolling."); <u>see also Irwin</u> v. <u>Dep't of Veterans Affairs</u>, 498 U.S. 89, 96 (1990).    Here, the plaintiffs' argument for a later accrual date under the discovery rule has been rejected because,

among other things, having become aware of the FBI's role in the deaths of their loved ones, they nevertheless failed to exercise due diligence in investigating the possibility of a claim.  See supra, Part II(E).  In such circumstances, the plaintiffs cannot successfully argue that the statute of limitations should be equitably tolled on the ground of fraudulent concealment.  Rakes, 442 F.3d at 26-27.  Put another way, "a plaintiff [who] could have turned up needed information through investigation, but has failed to exercise the requisite diligence, . . . will not be able to avail herself of [the] doctrine, and will lose her claim."  Id. at 27.

This principle is controlling here.  While we do not condone the government's history of stonewalling — for a long time it staunchly denied any relationship between Bulger, Flemmi, and the FBI, and concealed evidence concerning Halloran's and Donahue's murders — the plaintiffs' failure to conduct a reasonably diligent investigation after learning, actually or constructively, of the information disclosed in the Salemme hearings defenestrates the claim of equitable tolling.  As we said in connection with a similar claim in McIntyre, 367 F.3d at 61, "the government's denials were superseded when Morris testified in April 1998 in the Salemme hearings that he and Connolly . . . may have been responsible for Halloran's death."

- 34 -

## III.  CONCLUSION

We are not without sympathy for the plaintiffs' plight. The murders robbed both the Donahue and Halloran families of loved ones, and their losses were exacerbated by years of government evasion.  But statutes of limitation are designed to operate mechanically.  They aspire to bring a sense of finality to events that occurred in the distant past and to afford defendants the comfort of knowing that stale claims cannot be pursued.  See Rakes, 442 F.3d at 20.  Their mechanical operation may at times have seemingly harsh consequences, but the amelioration of such consequences is a matter for Congress rather than for the courts. See Skwira, 344 F.3d at 86 (Boudin, C.J., concurring); cf. Tasker v. DHL Ret. Sav. Plan, 621 F.3d 34, 43 (1st Cir. 2010) (observing that courts are not free to decide cases on generalized notions of fairness but, where statutes are in play, must follow the path demarcated by the legislature).

We add, moreover, that courts must apply legal rules even-handedly.  The fiasco brought about by Bulger's and Flemmi's seduction of the FBI has produced an endless stream of civil litigation, and this court, in a series of opinions, has carefully crafted a paradigm for dealing with the legal problems caused by the prolonged delay in the disclosure of that corrupt relationship. See, e.g., Patterson, 451 F.3d at 270-73; Rakes, 442 F.3d at 22-27; Callahan, 426 F.3d at 451-55; McIntyre, 367 F.3d at 51-61.  We must

- 35 -

apply the same paradigm here — and doing so requires us to draw a temporal line that bars the maintenance of these actions.

We need go no further. For the reasons elucidated above, we conclude that the plaintiffs' claims against the United States accrued no later than September 2, 1998. The claims are, therefore, time-barred. Accordingly, we <u>reverse</u> the district court's denial of the government's motions to dismiss, and <u>remand</u> with instructions to <u>vacate</u> the judgments previously entered and to enter judgment in <u>favor</u> of the United States in each case. Given this disposition, we <u>dismiss</u> the cross-appeal (No. 09-1952) as moot. All parties shall bear their own costs.

**<u>So Ordered</u>**.

## **Appendix**

      The following is a non-exhaustive chronological listing of newspaper articles which detailed the FBI/Bulger relationship in connection with Halloran's and Donahue's murders.  These articles appeared in the Boston media market beginning in July, 1997, and continued through September 2, 1998:

Ralph Ranalli, <u>FBI Used Whitey, Despite His Ties to 3 Murders</u>, Bos. Herald, July 7, 1997, at 1.

Shelley Murphy, <u>In '80s, FBI Saw Bulger as Both Informant and Murder Suspect</u>, Bos. Globe, Oct. 3, 1997, at A1.

Ralph Ranalli, <u>Police Reopen Mob Murder Probe; Miami Cops Eye Whitey Link in Slaying of Bay State Man; Hub Hearing May Help Crack Fla. Murder Case</u>, Bos. Herald, Dec. 15, 1997, at 1.

Ralph Ranalli, <u>FBI Suspected Leaks to Mob</u>, Bos. Herald, Dec. 15, 1997, at 4.

Shelley Murphy, <u>Witness Says FBI Kept Bulger as Informant Despite Suspicions</u>, Bos. Globe, Apr. 17, 1998, at B4.

Shelley Murphy, <u>Worst Fears Came True as Informant Lost Race for His Life</u>, Bos. Globe, Apr. 23, 1998, at B10.

Patricia Nealon, <u>Ex-Agent Says He Told of Informer[:] Fringe Gangster Turned Up Dead</u>, Bos. Globe, Apr. 23, 1998, at B1.

Peter Gelzinis, <u>'Good' Guys Weren't Good to Halloran</u>, Bos. Herald, Apr. 23, 1998, at 6.

Ralph Ranalli, <u>Ex-FBI Honcho: Agent Tipped Mobsters on Stoolie</u>, Bos. Herald, Apr. 23, 1998, at 1.

Patricia Nealon, <u>Prosecutor Hints Ex-FBI Handler of Bulger, Flemmi May Face Charges</u>, Bos. Globe, Apr. 25, 1998, at B3.

Ralph Ranalli, <u>Ex-FBI Agent Likely to Take Fifth</u>, Bos. Herald, Apr. 25, 1998, at 1.

Ralph Ranalli, <u>Ex-Agent Wants to Clear His Name</u>, Bos. Herald, May 1, 1998, at 5.

Ralph Ranalli, <u>'60 Minutes' Focuses [on] Hub FBI-Gangster Ties</u>, Bos. Herald, May 10, 1998, at 16.

Patricia Nealon, <u>DEA Agent Describes a Cocky Bulger</u>, Bos. Globe, May 16, 1998, at B4.

Ralph Ranalli, <u>Whitey Taunted Fed About Slain Stoolie</u>, Bos. Herald, May 16, 1998, at 15 (article includes photograph of Halloran).

Patricia Nealon, <u>Ex-FBI Official Tells of Keeping Bulger On</u>, Bos. Globe, May 22, 1998, at B5.

Ralph Ranalli, <u>Witness Weld; Ex-U.S. Attorney Believed FBI Had 'Problem,'</u> Bos. Herald, May 27, 1998, at 1 (describing Weld's testimony).

Peter Gelzinis, <u>Stippo Did Just What He Needed to Stay Alive</u>, Bos. Herald, May 28, 1998, at 6.

Ralph Ranalli, <u>FBI's Mafia Bugs in Peril — Key Wiretap Requests May Have Contained False Info, Weld Testifies</u>, Bos. Herald, May 28, 1998, at 1 (recounting Weld's testimony).

Ralph Ranalli, <u>Cop: Whitey Linked to IRA Gun-Running</u>, Bos. Herald, June 3, 1998, at 6.

Patricia Nealon, <u>Witness: FBI Let Languish a Tip Tying Bulger to Murder</u>, Bos. Globe, June 4, 1998, at F8 (noting Murray's tip).

Ralph Ranalli, <u>FBI Was Allegedly Told of Bulger Role in Murder</u>, Bos. Herald, June 4, 1998, at 4 (detailing Murray's allegations).

Matthew Brelis, <u>FBI Out of Balance[:] The Legendary Federal Agency, Its Reputation Shaken, Looks to Regain Its Sound Footing</u>, Bos. Globe, June 14, 1998, at F1.

David Webber, <u>Ex-Detective Says He Warned Kin: Don't Tape Whitey</u>, Bos. Herald, June 16, 1998, at 14.

Patricia Nealon, <u>Ground Rules for Flemmi Grilling Eyed</u>, Bos. Globe, June 25, 1998, at B4.

Ralph Ranalli, <u>Feds Hoping for a Hit from Mobster's Info on Murders</u>, Bos. Herald, July 20, 1998, at 1.

Shelley Murphy, <u>Cases Disappear as FBI Looks Away</u>, Bos. Globe, July 22, 1998, at A1 (five-part series includes photograph of Halloran).

Ralph Ranalli, <u>Fla., Ok. Will Grill Turncoat Mobster — Hope to Solve Murders</u>, Bos. Herald, July 23, 1998, at 5.

- 38 -

Ralph Ranalli, <u>Mystery Swirls Around '64 Mob Slaying, FBI Link</u>, Bos. Herald, July 28, 1998, at 10.

Ralph Ranalli, <u>Questions Arise over FBI Agent's Knowledge of Slaying</u>, Bos. Herald, Aug. 5, 1998, at 1.

Ralph Ranalli, <u>Ex-FBI Agent Says Slain Dealer Was Informer</u>, Bos. Herald, Aug. 6, 1998, at 6.

Patricia Nealon, <u>FBI Informant Runs Risk of Further Charges[;] Judge Refuses to Grant Request to Restrain Prosecutors' Questioning of Flemmi</u>, Bos. Globe, Aug. 19, 1998, at A19.

Patricia Nealon, <u>Flemmi Denies Protecting Agent in Court</u>, Bos. Globe, Aug. 27, 1998, at B4.

Ralph Ranalli, <u>Flemmi's 'Immunity' Challenged — Quizzed on Stand About Alleged Hit List</u>, Bos. Herald, Aug. 27, 1998, at 20.

Patricia Nealon, <u>Mob Trial Judge Orders Flemmi to Answer Some Questions</u>, Bos. Globe, Sept. 2, 1998, at B2.

Ralph Ranalli, <u>Flemmi Admits Tip-Off to Informant's Identity</u>, Bos. Herald, Sept. 2, 1998, at 6.

— Dissenting Opinion Follows —

**TORRUELLA**, <u>Circuit Judge</u> (Dissenting). The key difference between myself and the majority concerns the legal salience of the 1985 indictment, trial, and acquittal of Jimmy Flynn to the plaintiffs' FTCA claims. In my view, the majority turns a blind eye to the fact that, because a criminal conviction can only be secured by an exceedingly high standard of proof, many of the acquitted are in fact guilty of the crimes with which they are charged, and that it was therefore entirely reasonable for the Donahue and Halloran families to continue to view Flynn as the responsible party despite his acquittal at trial. I believe that this fact carries significant weight in our FTCA accrual analysis. Our cases have made clear that what it takes to trigger accrual in the FTCA context depends, in part, on whether the injured party already has a plausible explanation for his injury in hand. <u>See</u> <u>Cascone</u> v. <u>United States</u>, 370 F.3d 95, 105 (1st Cir. 2004). Because Judge Lindsay correctly appreciated the significance of both the prosecution of Flynn and the large span of years between the murders and the discovery of the government's complicity, <u>Donahue</u> v. <u>FBI</u>, 204 F. Supp. 2d 169, 177-78 (D. Mass. 2002), I would leave undisturbed the district court's judgment in favor of the plaintiffs.

## I.

The Halloran estate filed an administrative claim with the United States on September 25, 2000, and the Donahue estate followed suit on March 29, 2001. Therefore, their claims are barred by the

FTCA's two-year limitations period only if they accrued prior to September 25, 1998 for the Halloran estate, and prior to March 29, 1999 for the Donahues. 28 U.S.C. § 2401(b). The majority holds that the plaintiffs' FTCA claims accrued "no later than" September 2, 1998. Maj. Op. at 25. This was the day after a ruling by Judge Wolf publicizing statements by Stephen Flemmi acknowledging that he had been informed by the FBI of Edward Halloran's attempt to provide evidence linking Flemmi and James "Whitey" Bulger to the 1981 murder of Roger Wheeler. Id. at 11.

For reasons laid out below, I believe that the plaintiffs' claims did not accrue before March 30, 1999, which was several months before the district court issued its findings in United States v. Salemme, 91 F. Supp. 2d 141 (D. Mass. 1999), substantiated in relevant respect by Kevin Weeks in his plea agreement of July 2000.

## A.

In the months leading up to his murder, a number of interested parties wanted Halloran dead, and for reasons unrelated to the information he provided against Bulger. This list included Jimmy Flynn and Jimmy Mantville, who in fact later went on to claim credit for the hit.[6] As we noted in McIntyre, "members of Winter

---

[6]According to information later obtained from Weeks, Mantville claimed responsibility for Halloran's murder "even though he had nothing to do with it." Weeks reported that Mantville told him after the murder, "We finally got him," meaning Halloran.

Hill had made <u>several</u> attempts on [Halloran's] life" <u>before</u> January 1982, when Halloran first approached the FBI with information about Bulger. <u>McIntyre</u> v. <u>United States</u>, 447 F. Supp. 2d 54, 82 (D. Mass. 2006) (emphasis added). The sources of the anti-Halloran sentiment were not all related to his cooperation in the Wheeler probe. Flynn apparently had his own reasons for pique: during Flynn's trial, the prosecution theorized that Flynn killed Halloran because Halloran had facilitated Flynn's arrest on gun charges. Moreover, in a dramatic twist, Halloran himself unequivocally identified Flynn as his killer in a dying declaration. This provided strong evidence of Flynn's role as the gunman. <u>Cf.</u> <u>Giles</u> v. <u>California</u>, 554 U.S. 353, 397 (2008) (Breyer, J., dissenting) (explaining that a dying declaration is one made "when every motive to falsehood is silenced, and the mind is induced by the most powerful considerations to speak the truth" (citations and internal quotation marks omitted)). The state bolstered the credibility of this identification when it prosecuted Flynn for the murders. <u>So did the FBI, when it took steps to ensure that other information potentially linking Bulger to the murders was ignored or suppressed</u>.

**B.**

This background is crucial to this case because it shows that the Donahue and Halloran estates were not similarly situated to the families of other Bulger victims who have raised claims before this court. <u>See</u> <u>McIntyre</u> v. <u>United States</u>, 367 F.3d 38 (1st

-43-

Cir. 2004) (discussing claims by estates of John McIntyre and Roger Wheeler); <u>Callahan</u> v. <u>United States</u>, 426 F.3d 444 (1st Cir. 2005) (discussing claims by the estate of John Callahan). In particular, in those cases, no one had been charged and prosecuted for any of the murders, and Bulger was the prime suspect. Here, the Halloran and Donahue families held the sincere and reasonable belief that the murderer had been identified in May of 1982, when Halloran declared that Flynn was responsible, and the state subsequently prosecuted him, and they held this belief for sixteen years before learning the still more sordid truth. As Donahue's widow later explained,"[e]ven after we watched the jury find Mr. Flynn not guilty, I assumed that he must have been the murderer but that somehow his lawyer had gotten him off." Although Halloran's widow "did not follow" Flynn's trial, as it "was not going to bring Brian back," she stated that she "always assumed that they charged the person responsible."[7] Prior to the initiation of these lawsuits, <u>the victims' families were told by those investigating the murders</u>, to the extent they were told anything at all, that Flynn was responsible. Because the plaintiffs had a significantly more plausible explanation for their injury in hand, it would have been reasonable for a person in <u>these</u> plaintiffs' position to dismiss the apparently outlandish

---

[7]Indeed, until the publication of <u>Salemme</u> in the fall of 1999, Donahue's widow testified that she had never " . . . considered or had reason to consider that my own government, the same people who arrested and prosecuted Mr. Flynn, could have somehow been involved in my husband's murder."

possibility of a causal link between the FBI and the Donahue/Halloran murders as ungrounded speculation, at least until more substantiated evidence of the connection emerged in the fall of 1999.[8]

While it is true that our FTCA cases require that we impute to the plaintiffs knowledge of events widely reported in the media, see Rakes v. United States, 442 F.3d 7, 20 (1st Cir. 2006), it does not require us to insist that every plaintiff, however differently situated, draw the same conclusions from that knowledge. Indeed, our cases counsel precisely the opposite. See Cascone, 370 F.3d at 104. The majority appears to acknowledge as much, when it states that an FTCA claim accrues when "a prospective plaintiff has enough information to lead a reasonable person in his position to seek advice about a possible claim against the government." Id. (emphasis added). Indeed, our cases require us to distinguish between plaintiffs who have good, even if not overwhelming, reason to suspect government malfeasance lying behind their injury, and plaintiffs who have no such reasons. Compare Skwira, 344 F.3d 64 (1st Cir. 2003), with Cascone, 370 F.3d 95 (arising out of same

---

[8]The majority avers that in focusing here on who committed the murders, we have lost sight of the fact that "this is a suit which alleges wrongful disclosure, not wrongful death." Maj. Op. at 32 n.5. Let me therefore be clear: the claim is that the reasonable belief in Flynn's guilt means that the plaintiffs were not, in the exercise of due diligence, required to give credence to prima facie outlandish speculations in the papers that an internal leak at the FBI caused the murders.

pattern of criminal activity as Skwira). In Skwira, the defendants were aware that the government had exhumed the body of the deceased, had informed them that the cause of death listed on his death certificate was incorrect, and had initiated an investigation into the deaths occurring in the ward of the VA hospital where Skwira died -- meaning, given the context, that it was overwhelmingly likely that the malefactor was a government employee. Skwira, 344 F.3d at 80. They had, moreover, expressed their "surprise" and "shock[]" that Skwira had died of a heart attack given that he was admitted to the hospital "only for treatment of his alcoholism." Id. By comparison, in Cascone, we insisted that "the particular circumstances of individual plaintiffs can be relevant to" the accrual of their FTCA claim, and that "[t]he issue is whether a reasonable person similarly situated to the plaintiff would have known the necessary facts." Cascone, 370 F.3d at 104 (emphasis in original). The deceased in Cascone was a seventy-four-year-old man with a history of serious heart disease, including a condition that was listed as a cause of death, making it "perfectly reasonable" for the plaintiffs to believe "that the pneumonia [for which he was admitted to the hospital] exacerbated his preexisting heart conditions or that his heart problems simply happened to flare up at that point . . . ." Id. at 104 n.12. Thus, despite press coverage of the crimes, we found that

> [n]one of the Cascones had a reasonable basis
> to suspect that Cascone had died of anything

but his preexisting heart condition, even if
they should have known there was an
investigation.    "Where    the    plausible
explanation [for death] is one of purely
natural causes . . . , there is initially no
reasonable basis for supposing [misconduct].
It is not the purpose of the discovery rule to
encourage or reward simple paranoia."

Id. at 105 (citing Thompson v. United States, 642 F. Supp. 762, 768

(N.D. Ill. 1986)).

Just as the Cascones had no reason to suspect that the

explanation for Michele Cascone's death was false, and that in fact

he had been murdered by a government nurse, the Donahue and Halloran

families had no reason to suspect that the government's insistence

that Flynn was the gunman was a sham, and that in fact the

government itself bore a great deal of the responsibility for the

murders.   It must be borne in mind in this context that the high

standard of proof required to secure a criminal conviction means

that factually guilty individuals will regularly be acquitted of

their crimes.   This suggests, in turn, that it would not have been

reasonable to infer from Flynn's acquittal that Flynn was actually

innocent, and that someone else had committed the murders,

particularly in light of the significant evidence implicating Flynn

in the murders.   The view that Flynn had simply beaten the charges

was a rather more likely scenario than the far more outlandish and

disturbing truth that emerged years later.

For these reasons, I do not believe the plaintiffs' FTCA

claims accrued until well past the March 29, 1999 cut-off date, as

it was not until many months later -- on September 15, 1999 -- that Judge Wolf's <u>Salemme</u> decision came down, and that Winter Hill associates John Martorano and Kevin Weeks subsequently began testifying as to Bulger and Flemmi's role in the murders.

### C.

The majority raises a host of arguments to rebut this conclusion. First, the majority points to <u>Patterson</u> v. <u>United States</u>, 451 F.3d 268 (1st Cir. 2006), and claims that the Donahue and Halloran families "lack even the evanescent firmness of a wrongful conviction." <u>Maj. Op.</u> at 31. Respectfully, this is a misreading of <u>Patterson</u>. In <u>Patterson</u>, we rejected a plaintiff's argument that her FTCA claim only accrued when she was informed by her sister, in the summer of 2002, that the FBI was aware of plans to murder her father, failed to take any actions to prevent it, and even allowed two innocent men to be convicted for the crime. <u>Patterson</u>, 451 F.3d at 269-70. But, <u>pace</u> the majority, <u>Patterson</u> does not stand for the proposition that a settled and justified belief in someone else's guilt can have no relevance to the accrual of an FTCA claim. <u>Patterson</u> did not address that issue at all. Given the newly discovered evidence that emerged in that case, the plaintiffs were on notice that the original defendants were factually innocent, and that someone else had committed the murder (as it turns out, Flemmi's brother Vincent). <u>See generally</u> <u>Commonwealth</u> v. <u>Peter J. Limone</u>, 2001 Mass. Super. LEXIS 7 (Mass.

Super. Ct. Jan. 8, 2001). In contrast, the Donahues and Hallorans knew only that a jury had not been confident in Flynn's guilt beyond a reasonable doubt. This is a far cry from being told that Flynn was innocent, and that someone else, perhaps with the tacit approval of the FBI, had committed the murders.

Moreover, the effect of the wrongful convictions on the accrual of the plaintiffs' FTCA claim played no role in the Patterson court's reasoning, for good reason. The Massachusetts Superior Court vacated the wrongful convictions on January 8 and 18, 2001. However, the plaintiffs did not file their claims until January 27, 2003, more than two years later, and so no claim of reasonable reliance on the Limone and Salvati convictions was in the offing. See Patterson, 451 F.3d at 269. Instead, the plaintiffs raised arguments of lack of notice and medical disability. And, although the court rejected those arguments, pointing inter alia to the December 2000 publicity surrounding the news of the FBI's corrupt role in the murder and wrongful convictions, it made clear that what was "most important[]" to its analysis was the fact that one of the plaintiffs had himself been interviewed about these developments in December 2000, and therefore clearly knew of and, apparently, was "troubled by," the allegations. Id. at 273. This, of course, was enough to start the FTCA clock ticking. Cf. Merck & Co., Inc. v. Reynolds, 130 S. Ct. 1784, 1789-90 (2010) (holding that a cause of action accrues "when the plaintiff did in fact

-49-

discover," or "when a reasonably diligent plaintiff would have discovered, 'the facts constituting the violation' -- whichever comes first." (emphasis added)).

Second, the majority also seeks to discredit the district court's emphasis on the lengthy period of time between the murders and the revelations of FBI corruption. The majority does so by relying on McIntyre, Maj. Op. at 29, for the proposition that the extensive interval between the murders and the Salemme revelations has no bearing on the reasonableness of attributing knowledge of the latter to the plaintiffs. McIntyre involved, in pertinent part, claims arising out of the murder of Roger Wheeler in 1981. The court rejected the Wheeler estate's claims as untimely, reasoning that the widespread publicity from the Salemme hearings put the Wheelers on notice of their claims against the government. McIntyre, 367 F.3d at 58-59. But, again, the majority ignores the fact that the Donahue and Halloran families are differently situated from the Wheelers in one absolutely central respect. Unlike the Wheelers, the Donahue and Halloran families had been told that the murderer had been identified, and by bringing Flynn to trial, the government represented that they were confident -- indeed, confident beyond a reasonable doubt -- in his guilt. At no point after Flynn's acquittal did the government give the plaintiffs cause to think otherwise. According to Donahue's widow, "every time [she] asked the FBI for information regarding [her] husband's murder,

-50-

[she] was told that the FBI had none." (Emphasis added). (Not content with mere stonewalling, at one point FBI agents accused her of having an affair, which the agents suggested was the cause of the murder). The Wheelers had no officially sanctioned culprit on whom to pin responsibility for their injury. The Halloran and Donahues did. This fact changes the significance of the many intervening years -- from years spent seeking unforthcoming answers to an unsolved riddle, to years in which an officially sanctioned belief hardens into taken-for-granted fact.

Third, under the rubric of "generally available information," the majority points to John Morris' testimony during the Salemme hearings, as well as the ensuing media publicity. See Maj. Op. at 25-28. However, Morris's revelation on April 22, 1998 that Connolly had leaked news of Halloran's cooperation to Bulger did not call into question the reasonableness of the families' belief that Flynn was the killer. Morris's testimony provided a previously undisclosed motive for Bulger to kill Halloran, but others, including Flynn, shared a similar motive. Cf. McIntyre, 367 F.3d at 56 ("One could not reasonably infer, for purposes of FTCA accrual, from Morris's testimony about Halloran that the FBI told Bulger and Flemmi about every informant in their organization or that Bulger and Flemmi killed every person that they knew to be informing against them, regardless of the circumstances."). Where Bulger was but one of a number of individuals with a motive to kill

-51-

Halloran, where Halloran identified one of those non-Bulger individuals in a dying declaration, and <u>where the government insisted on the same at trial</u>, the bruiting about in the papers of a possible Bulger-FBI-Halloran connection, some sixteen years after the fact, cannot be deemed sufficient to set the limitations clock ticking.

The majority notes that "one need not have irrefutable proof" that an injury was caused by the government in order to file an administrative claim under the FTCA. <u>Maj. Op.</u> at 29 (citing <u>Skwira</u>). That much is true. But that is not yet to say quite enough. The Donahues and Hallorans had every reason to believe, and had in fact believed for sixteen years, that someone other than Bulger had committed the murder. The <u>government insisted</u> as much by bringing Flynn to trial and subsequently took no steps to disabuse the plaintiffs of this belief, even though the facts showing its falsity were locked away in the brains of recalcitrant government agents. So although the level of proof necessary for an injured party to file a claim under the FTCA is surely not "irrefutable," given the situation in which the Donahues and Hallorans found themselves, it was nevertheless substantial, and it was certainly more substantial than in cases where "overwhelmingly, the most likely malefactor was one of a very limited group of government employees," and involved "the same small cast of characters," <u>McIntyre</u>, 367 F.3d at 53. It makes a crucial

difference to our FTCA analysis, in other words, that the plaintiffs had a "plausible explanation for death" that does not provide a basis "for supposing [government] misconduct." <u>Cascone</u>, 370 F.3d at 105 (internal quotation marks and alterations omitted).

II.

The majority rejects the plaintiffs' claim of fraudulent concealment as well, on grounds that the plaintiffs "failed to exercise due diligence in investigating the possibility of a claim." <u>Maj. Op.</u> at 34. The gist of the majority's argument here is that, even though the Halloran and Donahue estates did not actually know about the media reports about the FBI-Bulger link, they <u>should</u> have, and they should therefore <u>also</u> have conducted further inquiry into the matter, a duty imposed purely by the fictional knowledge of newspaper articles that the court attributes to them -- and even though had they actually conducted such an inquiry, the only direction it would have led them is down the garden path.

I first note that the majority's reasoning under this heading depends crucially upon its central holding, that the Halloran and Donahue estates may be attributed with knowledge of the media reports of an FBI-Bulger link to the murders. This is because it is only if the presumption of such knowledge is reasonable that it makes sense to describe a failure to institute further investigations as some kind of shirking of an epistemic duty. If, as I have argued, the Halloran and Donahue estates have a perfectly

-53-

reasonable explanation for their ignorance -- clothed in the figure of one Jimmy Flynn -- then there is no duty of further investigation there to be shirked.[9]

Secondly, it is clear that any efforts by the Halloran and Donahue estates to further corroborate the media reports of a FBI-Bulger link to the murders would have been pointless. <u>The government was at this point pursuing a strategy of dissimulation, denial and stonewalling</u>. Judge Wolf noted in his <u>Salemme</u> opinion that government intransigence during the hearings meant that it remained unclear whether Flemmi and Bulger played <u>any</u> role in Halloran's murder. <u>Salemme</u>, 91 F. Supp. 2d at 212-13. <u>The government withheld key documents from the defense relating to Halloran's murder, in violation of discovery obligations</u>, until <u>after</u> Morris had testified, thus preventing cross-examination of Morris as to their content. <u>See</u> <u>United States</u> v. <u>Flemmi</u>, 195 F. Supp. 2d 243, 249-50 & n.39 (D. Mass. 2001) (detailing FBI

---

[9]I note that even if our cases require attributing knowledge of widely disseminated media reports, this is because this is "the only practicable course," given the function of a statute of limitations as a "rule of repose." <u>Rakes</u>, 442 F.3d at 20. It is not because it is somehow objectively unreasonable for people in the plaintiffs' position -- whose husbands and fathers had been brutally murdered, and who were left to raise small children on their own -- to refuse to re-open an inquiry long thought closed. Re-opening such an inquiry would carry significant psychic costs, and we need not go so far as to imply that refusing to bear those costs is somehow <u>per se</u> unreasonable, even if we must, for other reasons, nevertheless attribute the corresponding knowledge. The suggestion that this case may be decided under the rubric of the plaintiffs' unreasonable shirking of epistemic duties is simply to add insult to injury.

misconduct during the <u>Salemme</u> hearings).  Indeed, not only did the
government fail to produce the FBI reports containing Halloran's
allegations against Bulger and Flemmi during the <u>Salemme</u> hearings,
<u>they insisted during the discovery phase of this case that it was</u>
<u>"not known how Bulger and Flemmi obtained information that Halloran</u>
<u>was providing information to the FBI</u>," and noted that there' were
other reasons why members of Winter Hill, and its hangers-on, might
have wanted Halloran dead.  This disingenuous profession of
ignorance was made in 2005 -- <u>years after</u> the publication of <u>Salemme</u>
and Martorano and Weeks' confirmations of the FBI's complicity in
the murders.  <u>See</u> <u>United States</u> v. <u>Connolly</u>, 341 F.3d 16, 23-24 (1st
Cir. 2003) (describing Weeks and Martorano's testimony at FBI agent
John Connolly's trial).  Taking the government at its word here
means that the plaintiffs -- who, of course, had far less access to
the relevant information -- cannot be charged with uncovering
corroborating evidence in the exercise of "due diligence."  <u>See</u>
<u>Attallah</u> v. <u>United States</u>, 955 F.2d 776, 780 (1st Cir. 1992).

### III.

Unsurprisingly, the lurid story of the FBI's decades-long
entanglement with Bulger and Flemmi has given this court plenty of
opportunity to consider these issues.  Our cases on this topic
exhibit an arguably gratuitous hostility to FTCA claimants.  <u>See</u>
<u>Skwira</u>, 344 F.3d at 69 (holding that a plaintiff's wrongful death
claim was untimely, even though at the date we held their claim to

have accrued, the plaintiffs could not possibly have discovered that the decedent had been poisoned as there were no known scientific methods for testing for the drug used, and, moreover, the plaintiffs were regularly told by a government employee that autopsy results were consistent with death by natural causes). This hostility is particularly indefensible given that the heightened pleading burden plaintiffs bear under Ashcroft v. Iqbal, 129 S. Ct. 1937, 1949-50 (2009), means that plaintiffs who are unable to corroborate their claims are likely to find themselves on the receiving end of a motion to dismiss. The majority suggests that FTCA plaintiffs may file a claim with insufficient corroborative evidence and then request the agency to hold the claim in abeyance as further investigation proceeds. Maj. Op. at 30, citing Skwira, 344 F.3d at 81-82 n.17. The statutory text neither imposes such a duty on FTCA plaintiffs, nor requires agencies to agree to such requests. See 28 U.S.C. §§ 2671-80. It is unclear that this paragon of lawyerly procedure -- sue now, ask questions later -- would occur to any but the most litigiously-minded or chronically risk-averse layman. Moreover, by requiring premature filing of FTCA claims, the majority's position may well require lawyers to act in contravention of both the pleading standards established by the Federal Rules of Civil Procedure and their ethical obligations.[10]

---

[10]Fed. R. Civ. P. Rule 11(b) provides that "[b]y presenting to the court a pleading, written motion, or other paper . . . an attorney or unrepresented party certifies that to the best of the

Despite our warning in <u>Cascone</u> that our FTCA jurisprudence should not "reward or encourage simple paranoia" among plaintiffs, our cases may give the impression of counseling precisely this -- namely, that injured parties should bring their claims as soon as they learn of uncorroborated speculation in the papers or even the mere "rumor of a claim," for fear of later discovering their claims to be forever barred. Because it in effect lowers the bar for accrual to a "mere hunch, hint, suspicion, or rumor of a claim," <u>McIntyre</u>, 367 F.3d at 52, today's decision is another step down this paranoia-inducing road. Our cases, stingy as they already are, do not require this result, nor should <u>rex non potest peccare</u>,[11] when applied in the twenty-first century, allow for such an unjust outcome which rewards official uncontrolled wickedness. I dissent.

---

person's knowledge, information, and belief, formed after an inquiry reasonable under the circumstances: . . . (3) the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation and discovery." ABA Model Rules of Professional Conduct Rule 3.1 provides that "[a] lawyer shall not bring or defend a proceeding, or assert or controvert an issue therein, unless there is a basis in law and fact for doing so that is not frivolous, which includes a good faith argument for an extension, modification or reversal of existing law."

[11]"The King can do no wrong." <u>See</u> William Blackstone, I <u>Commentaries</u> *237.